COMMONWEALTH of Pennsylvania, Acting by Attorney General Thomas W. CORBETT, Jr.

v.

Lawrence C. MANSON, Jr., individually and as Chief Executive Officer, Unclaimed Freight Company, LLC and Unclaimed Freight Company, LLC.

Appeal of: Lawrence C. Manson, Jr.

Commonwealth Court of Pennsylvania.

Argued June 5, 2006.

Decided July 10, 2006.

Melissa M. Riahei, Chicago, IL, for appellant.

Howard G. Hopkirk, Harrisburg, for appellees.

BEFORE: McGINLEY, Judge, SMITH–RIBNER, Judge, and FRIEDMAN, Judge.

OPINION BY Judge FRIEDMAN.

Lawrence C. Manson, Jr., (Manson) appeals from the July 20, 2005, order of the Court of Common Pleas of Northampton County (trial court), which denied the Motion for Post–Trial Relief filed by Manson after the trial court found that he had violated the Unfair Trade Practices and Consumer Protection Law (Consumer Protection Law)[1] by engaging in deceptive conduct. We affirm.

Manson was the Chief Executive Officer (CEO) and lead investor of Unclaimed Freight Company, LLC, (Unclaimed Freight) from March 2001 to June 2002. (Findings of Fact, No. 2.) Unclaimed Freight was a company engaging in trade and commerce within the Commonwealth of Pennsylvania through the sale of furniture at several store locations. (Findings of Fact, No. 1.)

Unclaimed Freight took orders for merchandise and received payments from customers when Unclaimed Freight knew or should have known that the merchandise would not be delivered to those customers. (Findings of Fact, No. 3.) Unclaimed Freight provided neither furniture nor refunds to several customers. (Findings of Fact, No. 4.) When Unclaimed Freight took such actions, Manson had authority to control the company and, in fact, did control the company's day-to-day operations. (Findings of Fact, No. 5.) Thus, because Manson was aware that the company was taking orders and receiving funds for merchandise that it knew or should have known would not or could not be delivered to the customers, Manson participated in, took part in and cooperated in such conduct. (Findings of Fact, Nos. 6–8.)

On November 25, 2002, the Commonwealth of Pennsylvania (the Commonwealth), acting through the Attorney Gen-

<hr />

1. Act of December 17, 1968, P.L. 1224, *as* *amended,* 73 P.S. §§ 201–1 to 201.9.3.

eral, filed a complaint against Unclaimed Freight and Manson. In its complaint, the Commonwealth averred, *inter alia,* that the defendants violated section 2(4)(xxi) of the Consumer Protection Law, which prohibits fraudulent or deceptive conduct that is likely to create confusion or misunderstanding.[2]

The Commonwealth was unable to serve a copy of the complaint on Manson, who resided in Chicago, Illinois, until February 18, 2004. (O.R., Item 7, Certificate of Service.) Manson then filed an answer with new matter, and the Commonwealth filed a reply to the new matter. On October 20, 2004, the trial court entered default judgment against Unclaimed Freight, and the Commonwealth proceeded against Manson.[3]

At a pre-trial conference on December 8, 2004, the Commonwealth stated that it was seeking restitution for more than 400 consumers and was planning to either submit a stipulation as to the amount of damages or present testimony by the agent who reviewed the consumer complaints. (12/8/04 conf., N.T. at 10.) The trial court stated that an agent's testimony would be hearsay. The Commonwealth then offered to provide consumer affidavits. However, the trial court stated that the Commonwealth could not prove its case with affidavits. (12/8/04 conf., N.T. at 10–11.) The Commonwealth then suggested bifurcating the case and determining liability before damages, but Manson opposed bifurcation. (12/8/04 conf., N.T. at 11–13.) On February 7, 2005, the Commonwealth filed a

second pre-trial memorandum, adding as witnesses the names of forty-three consumers who filed complaints. (O.R., Item 29.)

At a pre-trial conference on February 9, 2005, the Commonwealth formally moved to bifurcate the case. The Commonwealth stated that, to establish liability, it would be calling as witnesses a representative number of the consumers who filed complaints. (2/9/05 conf., N.T. at 6–7.) The Commonwealth stated that it sent affidavits to more than 400 consumers, that it gave a copy of the affidavit to opposing counsel and that twenty-three consumers had returned their affidavits, showing damages of $19,772.51. (2/9/05 conf., N.T. at 7.) Manson objected to the affidavits as hearsay and asserted that, because he was being held personally liable for each violation, he had the right to cross-examine each consumer. (2/9/05 conf., N.T. at 8.) The trial court denied the motion to bifurcate and ruled that the Commonwealth could present ten witnesses on both liability and damages, after which the trial judge would decide whether to grant a continuance so that the Commonwealth could present additional witnesses and establish further damages. (2/9/05 conf., N.T. at 17–18.)

On May 2, 2005, the first day of trial, the Commonwealth called ten consumer witnesses and then sought to present as witnesses fifty other consumers who were attending the trial but who had not been identified as witnesses in the Common-

2. Section 3 of the Consumer Protection Law declares unlawful "unfair or deceptive acts or practices in the conduct of any trade or commerce as defined by subclauses (i) through (xxi) of clause (4) of section 2 of this act." 73 P.S. § 201–3. Section 2(4)(xxi) of the Consumer Protection Law defines "unfair or deceptive acts or practices" to include any "fraudulent or deceptive conduct which cre-

ates a likelihood of confusion or of misunderstanding." 73 P.S. § 201–2(4)(xxi).

3. The parties conducted discovery until November 1, 2004. On December 3, 2004, the Commonwealth filed its pre-trial memorandum, and, on December 6, 2004, Manson filed his pre-trial memorandum. (O.R., trial court docket.)

wealth's pre-trial memorandum. Manson sought to preclude their testimony under a local rule which limits parties to witnesses divulged prior to trial, unless the opposing counsel waives the restriction or the court finds the limitation to be manifestly unjust. (N.T. 5/2/05 at 115–16.) The trial court allowed one of the undisclosed consumer witnesses to testify but, afterward, continued the trial to allow Manson's attorney an opportunity to "do whatever [discovery] she's allowed to do" under the Pennsylvania Rules of Civil Procedure with respect to the others. (N.T. 5/2/05 at 131–32.) The trial judge stated, "I'm available to help with discovery disputes." (N.T. 5/2/05 at 133.)

On May 3, 2005, the Commonwealth reported to the trial judge that both parties had spoken to the undisclosed consumer witnesses and that the Commonwealth was ready to present its first witness. Manson objected, contending that he did not have enough time to conduct a meaningful interview with the undisclosed consumers. However, the trial judge stated, "I did not put any limitation [on the time]." (N.T. 5/3/05 at 7–8.) The trial judge then allowed the Commonwealth to present the undisclosed consumer witnesses.

■ After the trial, the trial court concluded from the evidence presented that Manson violated section 2(4)(xxi) by engaging in deceptive conduct likely to create confusion or misunderstanding. The trial court issued an order permanently enjoining Manson from further violations and directing him to pay $20,178.88 in restitution and $20,000.00 as a civil penalty. Manson filed a Motion for Post–Trial Relief, which the trial court denied. Manson now appeals to this court.[4]

4. When reviewing the trial court's denial of post-trial motions, our scope of review is limited to determining whether the trial court abused its discretion or committed an error of

## I. Personal Participation Theory

■ Manson argues that the trial court erred in using a "personal participation" theory to conclude that Manson violated section 2(4)(xxi). We disagree.

■ Pennsylvania law recognizes the participation theory as a basis for liability. *Wicks v. Milzoco Builders, Inc.,* 503 Pa. 614, 470 A.2d 86 (1983).

> The general, if not universal, rule is that an officer of a corporation who takes part in the commission of a tort by the corporation is personally liable therefor; but that an officer of a corporation who takes no part in the commission of the tort committed by the corporation is not personally liable to third persons for such a tort … unless he specifically directed the particular act to be done or participated, or cooperated therein.

*Id.* at 621–22, 470 A.2d at 90. Liability under this theory attaches only where the corporate officer is an actor who participates in the wrongful acts; thus, corporate officers may be held liable for misfeasance. *Id.* However, corporate officers may not be held liable for mere nonfeasance. *Id.*

Here, Unclaimed Freight took orders and received funds from customers for merchandise when it knew or should have known that the merchandise would not be delivered to those customers. Manson was aware of this practice, controlled the company's day-to-day operations and the company's deceptive practice continued under his control. Thus, Manson participated in or cooperated in the wrongful act.

## II. Deceptive Conduct

■ Manson next argues that the trial court erred in using a "should have

law. *Ford v. Philadelphia Housing Authority,* 848 A.2d 1038 (Pa.Cmwlth.2004), *appeal dismissed,* 583 Pa. 439, 879 A.2d 162 (2005).

known" negligence standard, instead of the standard for fraud, to conclude that Manson engaged in deceptive conduct in violation of section 2(4)(xxi). We disagree.

Prior to the 1996 amendments to the Consumer Protection Law, section 2(4)(xxi) merely prohibited "fraudulent conduct," and a plaintiff had to establish the elements of common law fraud to prove a claim. *Commonwealth v. Percudani*, 825 A.2d 743 (Pa.Cmwlth.2003), *amended*, 851 A.2d 987 (2004). The 1996 amendments revised the provision to prohibit "fraudulent or deceptive conduct." *Id.*

Even after the 1996 amendments became effective, our superior court has continued to interpret section 2(4)(xxi) to require that a plaintiff establish the elements of common law fraud to prove a claim. *Id.* However, this court has rejected that interpretation because: (1) the statute is to be liberally construed to effectuate the legislative goal of consumer protection; (2) the legislature's addition of the words "or deceptive" signals a less restrictive interpretation; and (3) maintaining the pre–1996 requirement would render the words "or deceptive conduct" redundant and su-

perfluous, contrary to the rules of statutory construction. *Id.*

▮▮▮▮ The question, then, is not whether a company or corporate officer engaged in conduct that was intended to deceive consumers.[5] Rather, the question is whether the company or corporate officer engaged in conduct that might be "deceptive to the ordinary consumer." [6] *Id.* at 746.

Here, the trial court found that Manson participated or cooperated in Unclaimed Freight's taking of orders and funds from customers when Unclaimed Freight knew *or should have known* that the merchandise would not be delivered to those customers. Assuming that Manson did not know, but should have known, that the customers would not receive their merchandise, *the consumers still were deceived by the conduct in which Manson participated or cooperated.* Because this court has held that the test for deceptive conduct is whether the conduct might be deceptive to the ordinary consumer, a lesser offense than fraudulent conduct, the trial court did not err in concluding that Manson engaged in deceptive conduct under section 2(4)(xxi) of the Consumer Protection Law.[7]

**5.** We note that to establish fraud, a plaintiff must prove: (1) the misrepresentation of a material fact; (2) scienter; (3) intention by the declarant to induce action; (4) justifiable reliance by the party defrauded upon the misrepresentation; and (5) damage to the party defrauded as a proximate result. *Colaizzi v. Beck*, 895 A.2d 36 (Pa.Super.2006). Thus, if Manson misrepresented that he could deliver the merchandise to induce a payment, *knowing* that he could not deliver the merchandise, received customer payments made in justifiable reliance on the misrepresentation and failed to make a refund, Manson defrauded the customers.

**6.** In *Percudani*, a company added to its consumer contracts a paragraph stating that the contract could not be cancelled once the consumer's legal right of rescission had expired

and that the consumer would be liable for liquidated damages for any subsequent breach or termination of the contract. This court stated that the language might be "deceptive to the ordinary consumer" because it could be interpreted to mean that the consumer has waived its right to assert legal defenses in a judicial action. *Percudani*, 825 A.2d at 746.

**7.** We note that the Commonwealth has *not* charged Manson with theft by deception. Under section 3922 of the Crimes Code, a person is guilty of theft by deception if he or she intentionally obtains or withholds the property of another by *intentionally* creating a false impression. 18 Pa.C.S. § 3922.

Moreover, the action brought here does not involve the tort of deceit, which consists of

### III. Evidence

█ Manson argues that the record lacks competent evidence to support the trial court's findings that: (1) Unclaimed Freight knew or should have known that the furniture ordered by its customers would not be delivered; and (2) Manson personally engaged in deceptive conduct.

In making these findings, the trial court relied upon the testimony of Robert Cuvo, a Director of Store Operations and Security; Andrew Eskow, a former CEO; and Raymond Petrilla, a Chief Financial Officer.[8]

Eskow testified that: (1) he worked at Unclaimed Freight from 1975 to March of 2001, (5/3/05 hearing, N.T. at 180); (2) Manson's firm bought the company in September 1999, (5/3/05 hearing, N.T. at 180); (3) Manson was a "very hands-on owner," was "involved in certainly all of the important decisions," and, as time went on, "really got involved much heavier and practically in every decision that was made for the company," "almost micro managing the business right down to the smallest detail," (5/3/05 hearing, N.T. at 182–83); (4) from January to March of 2001, Manson was at the store half the time, (5/3/05 hearing, N.T. at 181); and (5) "there were numerous, numerous, numerous conference calls, I'm not going to say on a daily

basis but pretty close to it," and during the conference calls, Manson was apprised of the situation with the inventory at the stores and the company's sales practices, (5/3/05 hearing, N.T. at 185–86).

Cuvo testified that: (1) he worked at Unclaimed Freight from January of 2001 to February of 2002, (5/3/05 hearing, N.T. at 190); (2) in February of 2002, he discussed the day-to-day operations with Manson, including inventory problems, (5/3/05 hearing, N.T. at 200); (3) it was common knowledge that there were problems with the inventory levels, i.e., there was not enough merchandise to fill the orders, (5/3/05 hearing, N.T. at 200); (4) "you couldn't go a day without it—every store manager calling ... the customer calls that were coming in, the warehouse manager complaining there was not merchandise," (5/3/05 hearing, N.T. at 200–01); (5) Manson gave a directive that, as a matter of policy, the company would not sell floor displays, (5/3/05 hearing, N.T. at 194); and (6) Manson was the final step in giving refunds to consumers, (5/3/05 hearing, N.T. at 195).

Petrilla testified that: (1) he became Controller of Unclaimed Freight in November of 2000 and CFO in 2002, (5/3/05 hearing, N.T. at 220); (2) in 2002, Manson

---

four elements: (1) a false representation of fact; (2) made with *knowledge* of its falsity; (3) with the *intention* that the plaintiff act on it in a manner that results in damage to him; and (4) the plaintiff does act upon the false statement and sustain damage. Black's Law Dictionary 435 (8th ed.2004).

Finally, in his brief, Manson makes arguments based on the economic loss doctrine in tort law. However, as indicated, tort law principles do not control here. Rather, this case involves the statutory construction of the words "deceptive conduct" in section 2(4)(xxi) of the Consumer Protection Law.

8. In his brief, Manson does not discuss Cuvo's or Eskow's testimony at all. Manson men-

tions testimony by Petrilla that Manson never engaged in any conduct that could be characterized as fraudulent or deceptive. (Manson's brief at 23.) However, this is the ultimate question before this court. Manson also refers to testimony by Petrilla that Unclaimed Freight entered into an agreement with National Sales Consultants to provide the credit support and merchandise needed to fulfill all outstanding orders. (Manson's brief at 22.) Although such testimony might support a finding that there was no reason for Unclaimed Freight to believe that it could not deliver the merchandise, the question here is whether the record contains evidence to support the trial court's contrary finding.

and senior staff tried to resolve the inventory issues by attempting to restructure the company's financing with First Union National Bank and by entering into an agreement with National Sales Consultants to fill outstanding orders with replacement merchandise and re-stimulate sales by providing credit support and merchandise, (5/3/05 hearing, N.T. at 213–15); (3) initially, National Sales Consultants was very successful but, at the end of May 2002, they terminated the relationship, (5/3/05 hearing, N.T. at 215); (4) Manson and senior staff talked to other sales promotion firms without success, (5/3/05 hearing, N.T. at 215–16); (5) Unclaimed Freight failed as a business at the end of June of 2002 because financing for furniture companies was cut back and because the sales "volume just wasn't there," (5/3/05 hearing, N.T. at 216–17); and (6) Manson was involved in all aspects of the business, a micro manager, (5/3/05 hearing, N.T. at 218).

This testimony constitutes substantial evidence to support the finding that Unclaimed Freight knew or should have known that it could not deliver all of the merchandise ordered by its customers. The testimony indicating that Manson was informed about inventory problems and sales practices, that Manson directed the company not to sell display merchandise, that Manson was the final step in the refund process and that Manson was involved in all aspects of the business constitutes substantial evidence to support the finding that Manson engaged in conduct that was deceptive to the ordinary consumer.

### IV. Additional Consumer Witnesses

■ Finally, Manson argues that the trial court abused its discretion by allowing consumer witnesses who had not been previously identified to testify at trial. We disagree.

Pa. R.C.P. No. 212.2(a)(3) requires that a pre-trial statement contain "a list of the names and addresses of all persons who may be called as witnesses by the party filing the statement, classifying them as liability or damage witnesses." Pa. R.C.P. No. 212.2(c) allows the trial judge to preclude or limit the testimony of any witness whose identity is not disclosed in the pre-trial statement if the trial judge determines that unfair prejudice will occur as a result.

■ Our supreme court has stated:

This Court's approach to the enforcement of procedural rules, whether local or state-wide, is dictated by the facts and circumstances in each individual case. To analyze otherwise would exalt procedural rules, which were created for efficiency and fairness, to a status far beyond their inherent power. "It has been our policy to overlook ... procedural errors when a party has substantially complied with the requirements of the rule and no prejudice would result. 'Procedural rules are not ends in themselves, but means whereby justice, as expressed in legal principles, is administered. They are not to be exalted to the status of substantive objectives.' "

Additionally, this Court has previously held that local rules cannot be construed so as to be inconsistent with the prevailing state-wide rules.

*Feingold v. Southeastern Pennsylvania Transportation Authority*, 512 Pa. 567, 572 517 A.2d 1270, 1272 (1986) (citations omitted). In determining whether to allow the testimony of a witness who has not been included in a pre-trial memorandum, courts may consider: (1) the prejudice or surprise in fact of the party against whom the excluded witnesses would have testified; (2) the ability of that party to cure the prejudice; (3) the extent to which

waiver of the rule against called unlisted witnesses would disrupt the orderly and efficient trial of the case or of other cases in the court; and (4) bad faith or willfulness in failing to comply with the rule. *Id.*

Considering the *Feingold* factors, there can be no dispute that Manson was, in fact, surprised on the day of trial by the appearance of as many as fifty undisclosed witnesses. However, the trial court was able to cure any prejudice by allowing Manson an opportunity to depose the individuals.[9] As to the extent that the waiver of the rule disrupted the orderly and efficient trial of the case, the trial in this case was continued for only one afternoon to allow Manson an opportunity to depose the consumer witnesses. Finally, with respect to bad faith, the trial court had instructed the Commonwealth to present ten consumer witnesses and then request permission to present additional witnesses. That is precisely what the Commonwealth did here, inviting consumers to attend the trial in the event that the trial judge was inclined to hear their testimony.[10]

Accordingly, we affirm.

### ORDER

AND NOW, this 10th day of July, 2006, the order of the Court of Common Pleas of Northampton County, dated July 20, 2005, is hereby affirmed.

---

**9.** Although Manson objected that he had insufficient time to cure the prejudice, the trial court stated that it had not limited the amount of time that Manson could spend with the witnesses. Because Manson did not move for a continuance to conduct further discovery, Manson cannot now complain that the trial court denied him an opportunity to fully cure the prejudice.

**10.** The trial court actually allowed the additional consumer witnesses to testify as to damages based on Northampton County local rule N212B(c)(5), which provides an exception to the above rule in cases where it would be manifestly unjust to limit a party's presentation of evidence. We agree with the trial court that, because Manson was not unfairly prejudiced, it would have been manifestly unjust to preclude additional consumer witnesses from testifying.