IN THE COMMONWEALTH COURT OF PENNSYLVANIA

Jeffrey A. Wright,                  :
             Appellant         :
                                     :   No. 1343 C.D. 2015
            v.                  :
                                       :   Argued: February 9, 2016
Lower Salford Township Municipal    :
Police Pension Fund, Lower Salford    :
Township Board of Supervisors,       :
Lower Salford Township Municipal     :
Police Pension Fund Trustees and      :
Standard Insurance Company         :

BEFORE:    HONORABLE PATRICIA A. McCULLOUGH, Judge
                  HONORABLE ANNE E. COVEY, Judge
                  HONORABLE JAMES GARDNER COLINS, Senior Judge

OPINION BY
JUDGE McCULLOUGH                                FILED: April 1, 2016

        This case returns to us following our remand for further proceedings in *Wright v. Lower Salford Township*, (Pa. Cmwlth., No. 788 C.D. 2012, filed June 19, 2013) (unreported) ("*Wright I*"). Jeffery A. Wright (Wright) appeals from the June 24, 2015 order of the Court of Common Pleas of Montgomery County (trial court) entering judgment in favor of the Lower Salford Township Municipal Police Pension Fund, the Lower Salford Township Board of Supervisors (Board), and the Lower

Salford Township Municipal Police Pension Fund Trustees (together, Township Defendants) on his claim seeking a disability pension.[1]

## Facts/Procedural History

As recounted in *Wright I*, this Court set forth the factual and procedural history of this case as follows. On January 23, 1996, Sergeant Wright sustained a knee injury while working as a police officer for the Lower Salford Police Department. Following knee surgery, Wright returned to duty at various times, sometimes at full-duty capacity and sometimes at light-duty capacity. Despite his efforts to continue working as a patrol sergeant, Wright eventually became unable to perform his job duties. At a public meeting on May 16, 2002, the Board unanimously voted to honorably discharge Wright from the police department. *Wright I*, slip op. at 2.

On April 17, 2002, one month before Wright's honorable discharge, the General Assembly amended the Municipal Police Pension Law, Act of May 29, 1956, P.L. (1955) 1804, *as amended*, 53 P.S. §§767-778, commonly known as Act 600. The 2002 amendment, commonly known as Act 30,[2] added a mandatory disability pension for permanent service-connected injuries, as follows:

> In the case of the payment of pensions for permanent injuries incurred in service, the amount and commencement of the payments shall be fixed by regulations of the governing body of the borough, town, township or regional police department and shall be calculated at a rate no less

---

[1] In his complaint, Wright also included a claim against Standard Insurance Company for a limited disability insurance benefit. This claim was settled prior to the entry of judgment in favor of the Township Defendants and, therefore, Standard Insurance Company is not a party to this appeal.

[2] Act of April 17, 2002, P.L. 239.

than fifty per centum of the member's salary at the time the disability was incurred, provided that any member who receives benefits for the same injuries under the Social Security Act . . . shall have his disability benefits offset or reduced by the amount of such benefits.

Section 5(e)(1) of Act 600, 53 P.S. §771(e)(1). "Before the enactment of Act 30, municipalities were not required to pay police officers a disability pension; Act 30 amended Act 600 to create such an obligation." *Wright I*, slip op. at 2-3.

On January 6, 2003, eight months after Wright's honorable discharge, the Board amended the Lower Salford Code by adopting Ordinance 2003-2 (Ordinance), which incorporated Act 30's requirements. The Ordinance states:

> In the case of the payment of pensions for **permanent injuries incurred on or after April 17, 2002**, the amount of the payments shall be calculated at the rate of 50% of the member's salary at the time the disability was incurred, provided that any member who receives benefits for the same injuries under the Social Security Act . . . shall have his or her disability benefits offset or reduced by the amount of such benefits. Determination of eligibility of disability benefits shall be based on the eligibility of benefits payable for permanent injuries incurred in service under the Township's long-term disability policy and shall be payable commencing at the later of termination of benefits under the long-term disability policy as a result of attaining the maximum age under the disability policy or upon the officer's attainment of his superannuation retirement date.

(Lower Salford Code §29-3(B)) (emphasis added).

In May 2006, Wright filed suit against the Township Defendants, seeking a disability pension calculated at 50% of his former salary, retroactive to May 16, 2002. The Township Defendants timely filed an answer and new matter. After the close of the pleadings, the Township Defendants moved for judgment on the pleadings. *Wright I*, slip op. at 3-4.

On April 4, 2012, the trial court granted the Township Defendants' motion. The trial court determined that Act 30 was not self-executing because its plain language mandated further legislative action by the local governing body. The trial court further determined that the Board did not adopt Act 30's provisions until January 2003, well after Wright's honorable discharge. Therefore, the trial court concluded that the Township Defendants were not obligated to pay Wright a disability pension. Wright filed a timely appeal to this Court. *Wright I*, slip op. at 4.

On appeal, this Court in *Wright I* concluded that material issues of fact existed that precluded the entry of judgment on the pleadings. We held:

> The trial court determined that Act 30 did not apply to the Township Defendants until the Board adopted the Ordinance incorporating Act 30's requirements in January 2003, which post-dated Wright's discharge. However, the Ordinance states that it applies to "payment of pensions for permanent injuries incurred *on or after April 17, 2002*." (Lower Salford Code §29-3(B) (emphasis added.) Therefore, regardless of whether Act 30 was self-executing, the text of the Ordinance suggests that it applies retroactively to permanent injuries incurred "on or after" Act 30's effective date. The trial court, however, did not address this issue.
>
> There is also a disputed factual issue regarding the date of Wright's "permanent" injury. Wright claims that although his initial knee injury occurred in 1996, his injury did not become permanent until May 16, 2002. According to Wright, the Board's vote to honorably discharge him was the first official determination that he was permanently disabled and could no longer work. The Township Defendants claim that the date of Wright's only service-connected injury was January 23, 1996, and his last day of work was March 12, 2002. Both of these events pre-dated Act 30 and the Ordinance. Again, the trial court did not address this issue.

4

> We conclude that the foregoing factual issues are material to the determination of whether Wright is entitled to the disability pension he seeks. Therefore, the trial court erred in granting the Township Defendants' motion.

*Wright I*, slip op. at 4-5 (footnotes and citation omitted).

On these grounds, this Court in *Wright I* reversed the trial court's order, reinstated Wright's complaint, and remanded the matter to the trial court for further proceedings.

On March 11, 2014, the trial court held a remand hearing on the limited issue set forth by this Court in *Wright I*, specifically whether Wright incurred a permanent injury on or after April 17, 2002. Based on the evidence presented, namely Wright's testimony and documentary evidence, the trial court made the following findings of fact.

On January 23, 1996, Wright sustained a knee injury while attempting to arrest a suspect. After being out of work for a brief period, Wright returned to full-duty on March 15, 1996. Wright sustained this cycle of being out of work and resuming his employment in full capacity as a police officer until after his fourth knee surgery on February 1, 2001. At that time, Wright resumed his employment, albeit in a limited-duty capacity. While on limited duty, Wright was responsible for reviewing the reports and conducting the evaluations of his squad, handling complaints by telephone, and ordering uniforms and necessary items for the vehicle fleet. Wright was also a range officer. (Trial court op. at 1.)

On March 13, 2002, Wright underwent an independent medical evaluation (IME) which, in part, reviewed the history of his injury. The IME stated that Wright returned to work with continued pain after his initial injury on January 23, 1996; underwent an arthroscopic surgery in October 1996; and did not return to work until he had a second operative procedure in March 1997. The IME further

stated that Wright underwent a cartilage transfer procedure in July 1998; returned to work approximately nine months post July 1998 at light duty and then worked regular duty for approximately a year with increased pain and swelling; and underwent a fourth arthroscopy in November 2000. According to the IME, Wright subsequently underwent surgery to reconstruct left ankle ligaments in March 2001 and had problems rehabilitating both extremities; returned to work in May 2001 at six hours per day at light duty; and went to physical therapy from July 2001 through the winter which aggravated his knee. The IME concluded that Wright reached his maximal medical improvement (MMI); recommended that he could work eight hours per day with the latitude to sit and stand as needed; and placed limitations on squatting, stooping and lifting.[3] (Trial court op. at 1-2.)

Due to the results of the IME, the Chief of Police sent a letter to Wright on March 14, 2002, indicating that Wright was no longer required to report for limited duty because he was unable to return to full duty. On May 6, 2002, the Board sent a letter to Wright advising him that he would be dismissed from his position as a police officer as a result of his physical disability. On May 16, 2002, the Board held a public meeting and a motion was approved to terminate Wright's employment with an honorable discharge. On May 20, 2002, the Board sent Wright a letter that reiterated the above information. (Trial court op. at 2.)

---

[3] In pertinent part, the diagnostic conclusion of the IME stated: "It is my opinion [Wright] could work eight hours per day with the latitude to sit as necessary. I would permit him to work eight hours per day, but I would allow him the latitude to sit as he needed to through the day and stand up and move as necessary. I would have him do no extended walking. I would not enforce sitting through the day because I would want him to be able to move his knee and change position as necessary. I would have him lifting no greater than ten to fifteen pounds. I would enforce no squatting, stooping, etc. At this time I would state he has reached [MMI] and no further treatment is indicated." (R.R. at 407a.)

6

Based upon these findings of fact, the trial court, by decision and order dated May 13, 2015, dismissed Wright's complaint. Citing *Messer v. Beighley*, 187 A.2d 168 (Pa. 1963), which dealt with the concept of "permanent injury" for purposes of calculating damages in a civil action, the trial court noted that "permanent" denotes something fixed, enduring, not subject to change, and that will continue regardless of a contingency or fortuitous circumstance. (Trial court op. at 4.)

Applying this definitional understanding, the trial court determined that Wright incurred a permanent injury on January 23, 1996, the date on which he was first injured while trying to arrest a suspect. The trial court stated that Wright returned to employment with continued pain; had several surgeries; later returned to work in a limited-duty capacity; and physical therapy aggravated his knee. The trial court also determined that the IME indicated that Wright had reached MMI, which suggested that his knee injury was never going to improve. Citing Wright's testimony that he could not perform the full duties of a street officer, and the fact that Wright listed February 22, 2002, as the date he became partially disabled on insurance forms, the trial court concluded that Wright's permanent injury occurred on January 23, 1996, and was fixed, enduring, and not subject to change. Because Wright sustained a permanent injury prior to the effective date of the Ordinance, April 17, 2002, the trial court concluded that Wright was ineligible to receive a disability pension. (Trial court op. at 4-5.)

Thereafter, Wright filed a motion for post-trial relief. By order dated June 24, 2015, the trial court denied Wright's motion and directed that judgment be entered in favor of the Township Defendants.

Wright now appeals to this Court.[4]

## Discussion

Wright contends that the trial court erred and/or abused its discretion in determining that the date of his permanent injury and disability was January 23, 1996, when the original injury occurred. Wright emphasizes that, in the time period subsequent to his original work injury, he worked full duty for approximately thirty-nine months (or three years and three months), and worked in a light-duty position intermittently and from February 2001 to his honorable discharge in May 2002. *See* Reproduced Record (R.R.) at 399a (detailing Wright's work history following his on-duty injury). While conceding that the effective date of the Ordinance is April 17, 2012, Wright asserts that his injury or disability did not become permanent until the Board made its determination on May 16, 2002, and that prior to this time, there had been no official determination or adjudication as to whether he was fully or totally disabled.

In response, the Township Defendants contend that the trial court's finding that Wright incurred a permanent injury in January 1996 is supported by competent evidence. The Township Defendants maintain that, at this point in time, Wright's injury was fixed, enduring, and not subject to change even though Wright had periods when he returned to full-duty employment. The Township Defendants further argue that there was no evidence submitted to indicate that Wright recovered in any way from the injury he sustained in January of 1996.

---

[4] "When reviewing the trial court's denial of post-trial motions, our scope of review is limited to determining whether the trial court abused its discretion or committed an error of law." *Commonwealth ex rel. Corbett v. Manson*, 903 A.2d 69, 73 n.4 (Pa. Cmwlth. 2006).

8

As we explained in *Wright I*, "Act 30 added a mandatory disability pension for permanent service-connected injuries," slip op. at 2, with the statute requiring municipal bodies to create regulations concerning the amount and commencement of payments of "pensions for permanent injures incurred in service . . . ." 53 P.S. §771(e)(1). Because Act 30 and the Ordinance create and provide for a disability pension, it cannot be disputed that the term "injury" in Act 30 and the Ordinance is synonymous with "disability." *See Norton v. Travelers Insurance Co.*, 105 F.2d 122, 123 (3d Cir. 1939) (interpreting the term "injury" in the statute to mean that "an injury is compensable . . . only when it produces disability.").[5] Such a compensatory scheme is inconsistent with our national jurisprudence and the underlying concepts of disability and the reasons prompting a disability pension. *See* Black's Law Dictionary, 529 (9th Ed. 2009) (stating that "disability compensation" or "disability benefits" are "[p]ayments from public or private funds to a disabled person who cannot work"); *id.* at 602 (defining a "disability retirement plan," in part, as "[a] plan that is invoked when a covered person is disabled from working to normal retirement age.").

In conducting its analysis, the trial court focuses on the term "permanent" in isolation. The trial court's reasoning fails to recognize that the term "injuries" in Act 30 and the Ordinance signifies "disability" and that "disability" is connected with an individual's physical ability to perform the duties of a particular job, in this case a police officer.

---

[5] In *Norton*, the United States Court of Appeals for the Third Circuit interpreted section 14 (m) of the Longshoremen's and Harbor Workers' Compensation Act, 33 U.S.C. §914(m), which provides that "the total compensation payable . . . for injury or death shall in no event exceed the sum of $7,500." *Norton*, 105 F.2d at 122. The court concluded that "an injury is compensable under this Act, only when it produces disability" and that "the phrase 'injury or death' must be interpreted as synonymous with 'disability or death.'" *Norton*, 105 F.2d at 123.

As outlined above, the predominate interpretive issue in this case is how to define "permanent disability" in the context of police-related work duties. "Where a term is not expressly defined in a statute, this Court will construe the term according to its common and approved usage. To do so, we may look to dictionary definitions." *Moonlite Café v. Department of Health*, 23 A.3d 1111, 1114 (Pa. Cmwlth. 2011) (citations omitted).

A "permanent disability" is one "that will indefinitely prevent a worker from performing some or all of the duties that he or she could do before an accident or illness." Black's Law Dictionary, 528 (9th Ed. 2009).

The concept of "permanent disability" in Act 30 and the Ordinance is further refined by section 1 of Act 600, 53 P.S. §767, which prohibits a township from prescribing regulations that would re-define disability pension eligibility to exclude officers who are honorably discharged for being disabled. 53 P.S. §767 ("Such [police pension] fund shall be under the direction of the governing body of the . . . township . . . and . . . for the benefit of such members of the police force as shall receive honorable discharge therefrom by reason of age and service, or disability . . . ."); *Ridley Park Police v. Borough of Ridley Park*, 524 A.2d 998, 1001-02 (Pa. Cmwlth. 1987) ("The clear language of this section mandates that *all* police officers honorably discharged for age and service, or disability, be eligible to receive a pension.") (emphasis in original). Reading Act 30 *in pari materia* with section 1 of Act 600, we conclude that where, as here, an officer is honorably discharged on the basis of a disability, the term "permanent disability" in Act 30 must be defined as one that renders an individual incapable of performing his duties as a police officer, as opposed to one which renders him incapable of any gainful employment in the marketplace. *See* Section 2 of the Police Tenure Act, Act of June 15, 1951, P.L. 586,

10

*as amended,* 53 P.S. §812 (providing for honorable discharge on the basis of a physical disability); *Ridley Park Police*, 524 A.2d at 1001 ("[A]s long as the Borough may honorably discharge a police officer who is disabled from performing police work, it may not deny that officer a pension simply because he is able to obtain other employment constituting 'substantial gainful activity.'").

Here, following his honorable discharge or termination in May 2002, Wright filed a complaint seeking a disability pension in accordance with Act 30 and the Ordinance. (Trial court op. at 2; R.R. at 412a.) As recounted by the trial court, there was evidence that Wright incurred a **partial** permanent disability prior to April 17, 2002, particularly Wright's testimony that he could not perform the full duties of a street officer; the March 13, 2002 IME indicating that Wright had reached MMI but could still work eight hours per day at a light-duty position with restrictions; and Wright's listing of February 22, 2002, on insurance forms as being the date on which he was partially disabled. Further, the uncontroverted evidence establishes that after his original work injury on January 23, 1996, Wright returned to full-duty status from March 15, 1996, to October 23, 1996; from August 6, 1997, to July 15, 1998; and from February 1, 1999, to November 3, 2000 – approximately three years and three months. (R.R. at 399a.) Thereafter, Wright returned to work in a light-duty capacity on February 1, 2001, and maintained limited-duty status up until the Chief of Police informed him not to return to work. (*Id.*)[6]

---

[6] On February 6, 2002, the Chief of Police issued a memo, listing the officers' duty assignments and stating that Wright was to work his limited-duty position, doing the duties of "Patrol Supervision, Vehicle Fleet, Uniforms, [and] Range Officer." (R.R. at 401a.) In a March 14, 2002 letter, the Chief of Police informed Wright that he is "no longer required to report for limited duty" because the findings in the March 13, 2002 MMI indicated that he will not be returning to full duty. (R.R. at 409a.)

11

This evidence, however, does not address whether Wright had a valid claim for **total** permanent disability. In *In re Anderson's Application for Disability Benefits*, 468 N.W.2d 338 (Minn. Ct. App. 1991), the Minnesota Court of Appeals collected and discussed several state court cases dealing with statutorily-created disability pensions. Based on this authority, the intermediate appellate court reiterated the general rule that a police officer is not totally disabled or incapacitated where the "police officer is capable of performing some of the responsibilities of the job classification" or "where a permanent light duty position is made available in [the officer's] job classification." *Id.* at 341. Consequently, the above evidence does not establish that Wright incurred a **total** permanent disability before April 17, 2002. At best, this evidence merely proves that Wright returned to his full-duty status for a period of time and was subsequently capable of performing light-duty police work (and, in fact, continued to do so up until the Chief of Police informed him not to).

Upon our review of the record, there is uncontradicted evidence that Wright was totally and permanently disabled subsequent to the effective date of the Ordinance. The trial court, however, failed to appreciate its legal significance.

On May 6, 2002, the Board wrote Wright a letter advising him that the Lower Salford Police Department is recommending that he be dismissed from his employment as a police officer. The letter stated:

> The basis for the recommendation is **your physical inability to perform your job which inability substantially interferes with your performing the essential functions of your employment** and which disability cannot be reasonably accommodated to the extent required by law. Accordingly, you are to be **dismissed from your police officer position with an honorable discharge due to your physical disability**.

12

(R.R. at 410a; emphasis added.) On May 20, 2012, the Board sent Wright a letter confirming that on May 16, 2002, the Board passed a motion to terminate Wright's employment "with an honorable discharge based on [his] inability to perform duties due to a physical disability." (R.R. at 437a.)

Under Pennsylvania law, the Board's May 16, 2002 motion constituted an official, administrative "adjudication" of Wright's physical disability. *See Clites v. Township of Upper Yoder*, 485 A.2d 724, 726 (Pa. 1984) (explaining that a board's decision to terminate an officer is an official "adjudication" under the Local Agency Law, 2 Pa.C.S. §§551-555, 751-754); *Kretzler v. Ohio Township*, 322 A.2d 157, 159-60 (Pa. Cmwlth. 1974) (discussing how a township's board of supervisors acts as an administrative agency when disciplining an officer and explaining that the officer is entitled to an administrative hearing). The evidence of record and applicable legal principles demonstrate that, although the MMI indicated that Wright could work light duty, the Board's May 16, 2002 motion to terminate was tantamount to a determination by the Board that Wright incurred a total permanent disability and was "indefinitely" unable "to perform employment-related duties because of a physical or mental impairment." Black's Law Dictionary, 528 (9th Ed. 2009).

Importantly, section 2 of the Police Tenure Act states that a police officer may only be terminated for, among other reasons, a "physical or mental disability affecting his ability to continue in service, in which case the person shall receive an honorable discharge from service . . . ." 53 P.S. §812.[7] In *Agostino v.*

---

[7] The Police Tenure Act applies to a "township of the second class [and] to each borough and township of the first class having a police force of less than three members. . . ." Section 1 of the Police Tenure Act, 53 P.S. §811. Lower Salford Township is a township of the second class. *See* http://www.lowersalfordtownship.org/boards/.

**(Footnote continued on next page…)**

13

*Township of Collier*, 968 A.2d 258 (Pa. Cmwlth. 2009), this Court upheld the township's board of commissioner's termination of an officer under this section where the evidence demonstrated that the officer was "unable to perform his duties" and "suffered a physical disability that rendered him unfit to serve as a police officer." *Id.* at 270.[8] In *Crawford v. Borough of Lewisburg*, 401 A.2d 385 (Pa. Cmwlth. 1979), we interpreted the language "affecting his ability to continue in service" to mean that the General Assembly "certainly intended the disability to be one which rendered the officer incapable of performing his normal duties permanently." *Id.* at 388.[9]

---

**(continued…)**

Section 2 of the Police Tenure Act vests a full-time police officer with a due process right to continued employment and sets forth the only circumstances under which a full-time police officer may be removed from office. *See Upper Makefield Township v. Pennsylvania Labor Relations Board*, 753 A.2d 803, 807 (Pa. 2000); *Pavonarius v. City of Allentown*, 629 A.2d 204, 207 (Pa. Cmwlth. 1993).

[8] In *Agostino*, the police officer was seriously injured in an off-duty motorcycle accident, completely lost his sense of smell, and the township's civil service commission granted him an honorable discharge based upon his disability. On appeal, this Court found "no error in the [the commission's] conclusion that [the officer's] Honorable Discharge was appropriate because the evidence sufficiently demonstrated that [the officer] suffered a physical disability that rendered him unfit to serve as a police officer. Critically, [the police officer] frequently patrolled alone and served as a first responder in instances that required a sense of smell to ensure his safety and the safety of others." *Id.* at 270.

[9] In *Crawford*, the trial court found that the police officer was permanently disabled from June 24, 1975, to December 1975, but was not permanently disabled after April 20, 1976. This Court noted that "permanent" means "existing perpetually" and "everlasting" and determined that the trial court erred in finding that the police officer was "'permanently' disabled at one time and *not* disabled less than a year later." *Id.* at 387-88 (citations omitted, emphasis in original). Although this Court agreed with the trial court that in order to dishonorably discharge a police officer, the police officer must be found to be incapable of performing his normal duties permanently, we concluded that the trial court's findings of fact were inconsistent and remanded to the trial court for further proceedings.

14

Collectively, *Agostino* and *Crawford* stand for the proposition that in order to terminate an officer under section 2 of the Police Tenure Act, the township's governing body must adjudicate the officer as suffering from a permanent disability, one where the officer cannot perform his police officer duties for an indefinite duration. Consequently, the Board's May 16, 2002 motion had the practical effect of adjudicating Wright as permanently disabled and honorably discharged him for that reason. In other words, the Board's May 16, 2002 motion determined that Wright was physically unable to perform his job as a police officer and that his disability was permanent, rendering him unfit to serve as a police officer in any capacity. There is no medical evidence, or any other evidence for that matter, to support a finding that Wright was totally and permanently disabled before the Board adjudicated him as such. In fact, Wright continued to perform his full-time duties, on and off, for years after the original injury. Therefore, we conclude that the trial court erred in determining that Wright did not incur a "permanent injury" or "permanent disability" on or after the effective date of the Ordinance, April 17, 2012.

**Conclusion**

For the above-stated reasons, we reverse the trial court's order entering judgment in favor of the Township Defendants. In situations where an officer is honorably discharged on the basis of a disability, we define the term "injury" or "disability" in Act 30 as one that renders an individual incapable of performing his duties as a police officer. As noted above, section 1 of Act 600 prohibits a township from prescribing regulations that would re-define disability pension eligibility to exclude officers who are honorably discharged for being disabled. *Ridley Park Police*, 524 A.2d at 1001. As a necessary corollary, police officers who are

15

honorably discharged for being disabled are entitled to a disability pension because they have been adjudicated by the municipal body as being physically unable to perform the duties of a police officer. *See also Crawford*, 401 A.2d at 388 ("[B]y providing for 'an honorable discharge from service' in the event of physical disability the legislature certainly intended the disability to be one which rendered the officer incapable of performing his normal duties permanently."). On the record before us, the Board's May 16, 2002 motion terminating Wright with an honorable discharge amounted to an adjudication that Wright's physical condition was of such an extent and duration that he could not perform the duties required of a police officer for the foreseeable future and, therefore, was permanently and totally disabled.

Accordingly, we conclude that Wright has established that he was permanently and totally disabled as of May 16, 2002; his disability, in turn, occurred after the effective date of the Ordinance and satisfies the definitional requirements of "permanent injuries" in Act 30 and the Ordinance. Having determined that Wright qualifies for a disability pension pursuant to Act 30 and the Ordinance, we reverse and remand to the trial court for further proceedings, namely a determination as to whether Wright meets the technical requirements – e.g., years of credited service, filing deadlines, requirements for submission of information, etc. – for benefits under the Township's long-term disability policy, as stated in the Ordinance. *See* Ordinance, §29-3(B) ("Determination of eligibility of disability benefits shall be based on the eligibility of benefits payable for permanent injuries incurred in service under the Township's long-term disability policy . . . .").

_____
PATRICIA A. McCULLOUGH, Judge

16

# IN THE COMMONWEALTH COURT OF PENNSYLVANIA

Jeffrey A. Wright,                  :
            Appellant      :
                         :    No. 1343 C.D. 2015
          v.                 :
                         :
Lower Salford Township Municipal  :
Police Pension Fund, Lower Salford  :
Township Board of Supervisors,      :
Lower Salford Township Municipal  :
Police Pension Fund Trustees and   :
Standard Insurance Company       :

## *ORDER*

AND NOW, this 1st day of April, 2016, the June 24, 2015 order of the Court of Common Pleas of Montgomery County (trial court) entering judgment in favor of the Lower Salford Township Municipal Police Pension Fund, the Lower Salford Township Board of Supervisors (Board), and the Lower Salford Township Municipal Police Pension Fund Trustees is hereby reversed. The case is remanded for further proceedings consistent with this opinion.

Jurisdiction relinquished.

_____
PATRICIA A. McCULLOUGH, Judge