IN THE COMMONWEALTH COURT OF PENNSYLVANIA

Stephen Sheppleman               :
                                     :
           v.               : No. 458 C.D. 2020
                                       : Argued: March 15, 2021
City of Chester Aggregated    :
Pension Fund,                  :
                                     :
                Appellant   :


BEFORE:    HONORABLE P. KEVIN BROBSON, President Judge
                  HONORABLE ANNE E. COVEY, Judge (P.)
                  HONORABLE MICHAEL H. WOJCIK, Judge


OPINION
BY JUDGE WOJCIK                           FILED: December 29, 2021

The City of Chester (City) Aggregated Pension Fund (Fund), which is administered by the City's Aggregated Pension Fund Board (Board), appeals from the April 22, 2020 order of the Delaware County Court of Common Pleas (trial court) accepting and approving Stephen Sheppleman's (Sheppleman) proposed findings of fact and conclusions of law, and directing the Fund to recalculate Sheppleman's service-connected disability pension award from the date of his disabling work injury on February 22, 2011, as opposed to the date that the Board approved his service-connected disability retirement on March 13, 2013. The Fund contends that the trial court violated its standard of review, misinterpreted the term "retirement," and erred by ordering the recalculation of benefits. Upon review, we affirm.

## I. Background

Pursuant to the parties' stipulations, Sheppleman was employed as a police officer for the City, beginning in April 1999. The City is a municipality,

incorporated as a Third Class City, operating under a Home Rule Charter and Administrative Code adopted pursuant to the Home Rule Charter and Option Plans Law (Home Rule Charter Law).[1]  Pursuant to this authority, the City created the Fund as the funding mechanism for the Police Pension Fund[2] and created the Board to serve as trustee and administrator of the Fund.  Stipulated Facts (S.F.) Nos. 1-5; Reproduced Record (R.R.) at 270a.

Section 143.03(f) of the Police Pension Ordinance (Ordinance), codified in Article 143 of the City's Administrative Code, provides:

> Beginning January 1, 1982, any police officer who becomes permanently and totally disabled as a result of an injury incurred while in the actual performance of his or her duty and who, by reason thereof, is unable to perform his or her duties as a member of the police force shall be entitled upon application to the Board to retire and to receive a monthly pension.  *Such pension shall be in an amount equal to one hundred percent (100%) of such police officer's average monthly earnings reportable or reported on the police officer's W-2 form for the twelve month period prior to his or her retirement.*

Section 143.03(f) of the Ordinance (emphasis added); *see* S.F. Nos. 5-6; R.R. at 24a, 270a-71a.  This language is consistent with Article XXIII of the collective bargaining agreement (CBA) between the City and the Fraternal Order of Police, Lodge No. 19, effective from January 1, 2012, to December 31, 2016.  S.F. No. 7; R.R. at 271a.

Sheppleman participated in the Fund.  On February 22, 2011, he suffered an injury while on duty, when he slid on ice and snow and aggravated a

---

[1] 53 Pa. C.S. §§2901-2984.

[2] The Fund is also the funding mechanism for the Paid Firemen's Fund and Officers and Employees Optional Retirement System.  Reproduced Record (R.R.) at 18a.

prior work injury. Sheppleman underwent multiple surgeries[3] and received indemnity benefits pursuant to the Workers' Compensation Act[4] and the act commonly referred to as the Heart and Lung Act.[5] During this time, he was not eligible for, and did not receive, overtime from the City. For the 12-month period preceding the February 22, 2011 injury, Sheppleman earned $86,823.48. Following his injury, his Internal Revenue Service W-2 Form (W-2 Form) for 2012 showed wages of $438.96 in box 1 and workers' compensation payments of $62,431.14 in box 14; his W-2 Form for 2013 similarly showed wages of $13.27 in box 1 and workers' compensation payments of $65,094.12 in box 14. Sheppleman was never able to return to work after the February 22, 2011 injury. An application was made on his behalf to the Board requesting service-connected disability benefits. In accordance with the Ordinance, Sheppleman submitted to three required medical examinations. On March 13, 2013, the Board voted to approve service-connected disability benefits for Sheppleman. S.F. Nos. 8-16, 19, Exhibit H; R.R. at 271a, 348a.

In July 2014, Sheppleman received a fact sheet from the City regarding his pension calculation. On July 25, 2014, Sheppleman received his first pension

[3] Sheppleman underwent surgery on March 31, 2011, January 13, 2012, and April 6, 2012.

[4] Act of June 2, 1915, P.L. 736, *as amended*, 77 P.S. §§1-1041.4, 2501-2710.

[5] Act of June 28, 1935, P.L. 477, *as amended*, 53 P.S. §§637-638. The Heart and Lung Act entitles certain enumerated state and local public safety personnel, including the City's police officers, to receive benefits in the full amount of their salary when they are injured in the performance of their duties rendering them temporarily unable to work. *See* Section 1 of the Heart and Lung Act, 53 P.S. §637.

payment.[6] The pension calculations were based on the 12-month period preceding the Board's March 13, 2013 decision. The Board utilized Sheppleman's W-2 Forms from 2012 and 2013, which were based on Sheppleman's compensation under the Heart and Lung and Workers' Compensation Acts, and did not take into account any pre-injury earnings, which had included overtime earned for assignments such as SWAT call outs, dive team call outs, narcotics work, training, and court time. S.F. Nos. 17-19; R.R. at 272a; Trial Court Op., 7/6/20, at 6.

Upon learning of the calculation methodology, Sheppleman wrote to Edith Blackwell, the City Controller and member of the Board (City Controller), and asserted that his disability benefit should be calculated based on his pre-injury earnings. According to Sheppleman's calculation, this adjustment would result in a $7,235.29 monthly benefit, as opposed to the $5,327.25 that he was awarded. S.F. Nos. 20-22; R.R. at 272a.

The Board previously calculated other disability pensions from the date of injury or application for benefits. Specifically, on March 24, 2010, the Board voted to grant a full disability pension to police officer Joseph Kane retroactive to the "date of his injury" on December 11, 2006. On March 24, 2010, the Board granted police officer Kevin Gyda, who was injured on October 3, 2005, a disability pension calculated as of the date of his application for service-connected disability benefits, pursuant to an arbitration award. On May 23, 2012, the Board granted police officer Regina Butcher a disability pension that was calculated as of the date of her injury on June 6, 2009. S.F. Nos. 23-25; R.R. at 272a.

---

[6] Once his disability pension benefits began, Sheppleman's Heart and Lung and workers' compensation benefits ceased.

4

On October 24, 2016, Sheppleman filed a Complaint in the trial court against the Fund challenging the calculation of his disability pension. S.F. No. 26; R.R. at 272a. Following discussions with counsel, and by stipulation and agreement of the parties, the trial court remanded the case to the Board for a local agency hearing. S.F. No. 27; R.R. at 69a, 272a-73a. By adjudication dated December 18, 2019, the Board determined that Sheppleman's pension benefit was properly calculated under the terms of the Ordinance, the CBA, and case law. R.R. at 73a-82a. Thus, the Board denied Sheppleman's request for a recalculation of benefits based on the 12-month period preceding his date of injury. *Id.* From this decision, Sheppleman filed a local agency appeal with the trial court on December 31, 2019.

Before the trial court, the parties further stipulated that: the trial court's review was governed by Section 754(b) of the Local Agency Law, 2 Pa. C.S. §754(b); a complete record was created before the Board; neither party could supplement the record; and the parties would file proposed findings of fact and conclusions of law with the trial court. R.R. at 315a.

By order dated April 22, 2020, the trial court determined that Sheppleman timely filed his appeal within 30 days of the Board's December 18, 2019 adjudication; accepted Sheppleman's proposed findings of fact and conclusions of law in their entirety; and concluded that the Board's calculation of Sheppleman's disability pension utilizing post-injury compensation violated the terms of the Ordinance, the CBA, and the Third Class City Code (City Code),[7] as well as his constitutional right to equal protection.

From this decision, the Fund appealed. In its statement of questions presented, the Fund challenged the timeliness of Sheppleman's appeal; whether the

---

[7] 11 Pa. C.S. §§10101-14702.

5

trial court exceeded its review under the Local Agency Law; and whether the Board's calculation was in conformance with the Ordinance, the CBA, the City Code, and constitutional provisions. The Fund also asserted that the trial court violated the Municipal Pension Plan Funding Standard and Recovery Act (Act 205)[8] by ordering the Fund to recalculate Sheppleman's pension benefit without an actuarial study.

In its supporting opinion filed July 6, 2020, the trial court articulated that Sheppleman's appeal was timely filed because the Board's March 13, 2013 approval of Sheppleman's service-connected disability pension was not an "adjudication" for purposes of the 30-day appeal deadline. Trial Court Op., at 8 (citing Section 5571(b) of the Judicial Code, 42 Pa. C.S. §5571(b)). "No adjudication of a local agency shall be valid as to any party unless he shall have been afforded reasonable notice of a hearing and an opportunity to be heard." *Id.* at 9 (quoting Section 553 of the Local Agency Law, 2 Pa. C.S. §553). There was no hearing before the calculation of the pension. Sheppleman was not notified of the calculation until July 2014, when he received the fact sheet regarding the calculation. Despite contacting City Controller, Sheppleman was never afforded an opportunity to challenge the calculation before the Board. Consequently, the trial court determined that the original complaint, filed on October 24, 2016, was not subject to the 30-day appeal deadline. Sheppleman's subsequent local agency appeal was timely filed within 30 days of the Board's December 18, 2019 decision upholding the calculation. The trial court also noted that the Fund's stipulation to remand the matter to the Board for a local agency hearing should be considered a waiver of any future claims of an untimely appeal. Trial Court Op., at 8-12.

---

[8] Act of December 18, 1984, P.L. 1005, No. 205, *as amended*, 53 P.S. §§895.101-895.1131.

6

As for the trial court's standard of review, the trial court cited Sections 753 and 754 of the Local Agency Law, 2 Pa. C.S. §§753, 754, as the applicable standard. Trial Court Op., at 13. Section 754(b) provides that where a complete record is made before the local agency, the court shall affirm the adjudication unless it shall find that the adjudication is in violation of the constitutional rights of the appellant or is not in accordance with the law, or that proceedings violated the practice and procedure of local agencies, or that any finding of fact is not supported by substantial evidence. 2 Pa. C.S. §754(b). If the adjudication is not affirmed, the court may enter any appropriate order to modify, vacate, set aside, or reverse or remand. *Id.*; Section 706 of the Judicial Code, 42 Pa. C.S. §706. The trial court opined that it applied the appropriate review. Trial Court Op., at 13-17.

As for the calculations themselves, the trial court determined that the pension adjudication violated Sheppleman's right to equal protection by treating him differently than similarly situated officers whose pensions were calculated based on pre-injury wages. The trial court noted that the Board has not been consistent in how it calculates an officer's disability pension. Based on the parties' stipulations, the trial court found that, on March 24, 2010, the Board voted to grant Officers Joseph Kane, Joe Nealon, and Officer Kevin Gyda full disability pensions retroactive to the date of injury. On May 23, 2012, the Board granted Regina Butcher a disability pension retroactive to the date of her injury. The trial court rejected the Fund's argument that these approvals were based on an arbitration award with no precedential value for future awards or were factually distinguishable. Trial Court Op., at 17-29.

In addition, the trial court found that the award failed to comply with the City Code, particularly Section 14303, relating to allowance and service

7

increments, and Section 14303.2, relating to total disability. 11 Pa. C.S. §14303, 14303.2. Under these provisions, the Board was required to calculate Sheppleman's disability pension from the date of injury or the date of retirement, whichever is higher, and Sheppleman was fully vested in the plan when he was injured. 11 Pa. C.S. §§14303, 14303.2. Although the City now operates by a home rule charter, Section 2901(c) of the Home Rule Charter Law prohibits the City from diminishing the rights or privileges of its municipal employees in their pensions. 53 Pa. C.S. §2901(c). Trial Court Op., at 17-18.

The trial court interpreted the term "retirement" as used in the calculation clause of Section 143.03(f) of the Ordinance, as well as the governing provision of the CBA, to mean the date of the injury that caused the total disability, not the date that the Board awarded service-connected disability benefits. The trial court opined that the Board cannot delay the determination of a service-connected disability pension and then use that delay to calculate the pension at a lower rate, which does not factor pre-injury earnings and overtime. Furthermore, the Ordinance states that benefits must be based on 100% of the officer's "earnings" for the 12-month period preceding his retirement. Sheppleman was receiving Heart and Lung and workers' compensation benefits after his injury, which are insurance benefits, and not earnings. His actual "earnings" reported on his W-2 Forms were less than $500.00 for the combined tax years of 2012 and 2013. The trial court opined that it would be unjust to allow the Board to calculate benefits from the year after the injury when Sheppleman was unable to perform his duties and earn income and overtime. The trial court cautioned that to conclude otherwise would incentivize the Board to delay the acceptance of disability pension to reduce the officers' pension entitlement

8

to the financial benefit of the City. Trial Court Op., at 18-20, 24.[9] This appeal now follows.[10]

## II. Issues

In this appeal, the Fund argues that the trial court violated its limited standard of review for appeals of local agency decisions by rejecting the Board's findings of fact and accepting Sheppleman's proposed findings without performing a substantial evidence analysis. Next, the Fund contends that the trial court's determination that Sheppleman's service-connected disability benefit must be recalculated from the date of injury is contrary to the terms of the City's Ordinance, the applicable CBA, the City Code, and case law. The Fund further asserts that the trial court erred in determining that Sheppleman's equal protection rights were violated where his pension was calculated consistent with the Ordinance and past practice. The Fund also contends that the trial court erred by entering an order that constitutes a pension benefit plan modification of the City's severely fiscally distressed Police Pension Fund, thereby violating Act 205 because no actuarial study was performed regarding the benefit plan modification. Finally, the Fund maintains that the trial court erred in determining that Sheppleman filed a timely local agency

---

[9] The trial court did not address the Fund's Act 205 argument.

[10] Where, as here, the trial court does not take additional evidence, our review is limited to determining whether constitutional rights have been violated, an error of law was committed, or the necessary factual findings are not supported by substantial evidence. 2 Pa. C.S. §754(b); *Spencer v. City of Reading Charter Board*, 97 A.3d 834, 839 (Pa. Cmwlth. 2014). An agency abuses its discretion when its findings of fact are not supported by substantial evidence. *Residents Against Matrix v. Lower Makefield Township*, 845 A.2d 908, 910 (Pa. Cmwlth. 2004). Substantial evidence is such relevant evidence as a reasonable mind might accept as adequate to support a conclusion. *Moorehead v. Civil Service Commission of Allegheny County*, 769 A.2d 1233, 1238 (Pa. Cmwlth. 2001).

9

appeal, despite such appeal being filed over two years after he began receiving service-connected disability benefits.

### III. Discussion
### A. Standard of Review

First, the Fund contends that the trial court violated the standard of review under the Local Agency Law by rejecting the findings of fact adopted by the Board and accepting those offered by Sheppleman. The Local Agency Law requires a reviewing court to affirm the Board's findings unless those findings are not based upon substantial evidence. The trial court conducted no analysis to determine whether the Board's findings were supported by substantial evidence. Rather, the trial court simply substituted its own judgment for that of the Board's, which is outside the scope of review and constitutes an abuse of discretion.

The trial court's standard of review is governed by Section 754 of the Local Agency Law, 2 Pa. C.S. §754. Subsection (b) provides:

> **Complete record.--**In the event a full and complete record of the proceedings before the local agency was made, the court shall hear the appeal without a jury on the record certified by the agency. *After hearing the court shall affirm the adjudication unless it shall find that the adjudication is in violation of the constitutional rights of the appellant, or is not in accordance with law*, or that the provisions of Subchapter B of Chapter 5 (relating to practice and procedure of local agencies) have been violated in the proceedings before the agency, *or that any finding of fact made by the agency and necessary to support its adjudication is not supported by substantial evidence.* If the adjudication is not affirmed, the court may enter any order authorized by 42 Pa. C.S. §706 (relating to disposition of appeals).

2 Pa. C.S. §754(b) (emphasis added). Substantial evidence is such evidence that a reasonable person would accept as adequate to establish the fact in question.

10

*Moorehead v. Civil Service Commission of Allegheny County*, 769 A.2d 1233, 1238 (Pa. Cmwlth. 2001). "A reviewing court will examine, but not weigh, the evidence" because the local agency, acting as the factfinder, "is in a better position to discover the facts based upon the testimony and the demeanor of witnesses. The court may not substitute its judgment for that of the [local agency]." *Id.* (citation omitted).

Here, the trial court reversed the Board's adjudication upon determining that it was not in accordance with the law and violated Sheppleman's constitutional right to equal protection. In so doing, the trial court adopted Sheppleman's findings of fact over the Board's findings without performing a substantial evidence analysis. Although the Fund asserts that this constitutes reversible error, the material facts are not in dispute. The parties stipulated to the relevant facts necessary to support the adjudication. *See* S.F. Nos. 1-27; R.R. at 270a-73a. Sheppleman's proposed findings merely offered additional details based on his unrebutted testimony. *See* R.R. at 84a-90a, 115a-57a. The real dispute centers on the trial court's legal interpretation and conclusions, not the factual findings themselves. The Fund does not cite to a specific finding of fact that the trial court improvidently rejected, but instead takes issue with the trial court's rejection of its expert's interpretation of the Ordinance. Specifically, the Fund points to the testimony of the City's Chief Financial Officer, Nafis Nichols (Nichols), who testified that the Ordinance should be interpreted so that the disability pension is calculated from the date that the Board approves the retirement, and not the date of injury. However, the interpretation of the Ordinance is a legal conclusion, not a question of fact. The trial court was not required to accept Nichols' interpretation of the Ordinance as fact. The trial court reversed the Board upon determining that

11

the Board's adjudication was not in accordance with the law and was in violation of Sheppleman's constitutional rights.

Although we agree with the Fund that the trial court strayed from its standard of review by adopting Sheppleman's findings in their entirety without performing any substantial evidence analysis to determine whether the Board's findings were supported, such error is harmless because the necessary findings of fact were reached by stipulation and are not in dispute in this case.

### B. Interpretation of "Retirement" under the Ordinance, City Code, CBA, and Case Law

Next, the Fund argues that the trial court's interpretation of the term "retirement," and the award of disability benefits from the date of injury, is contrary to the clear language of the Ordinance, the City Code, the CBA and case law. The Ordinance provides that if an officer is permanently disabled as a result of an injury suffered on duty, the calculation is based on the 12-month period preceding an officer's retirement. The CBA contains an identical provision that the calculation is based on the 12-month period prior to an officer's retirement. An officer's retirement occurs when the Board awards a service-connected disability benefit to the officer and honorably discharges him or her from service. The Fund maintains that Sheppleman was not immediately discharged from employment or even considered retired after the injury. Instead, he remained employed by the City and underwent surgeries in the hopes of returning to active duty, which never happened. During this time, Sheppleman received workers' compensation benefits and his full salary under Heart and Lung benefits. Following an application for retirement and three medical examinations, the Board awarded a service-connected disability benefit to Sheppleman on March 13, 2013. The Board's interpretation of its

12

Ordinance that the pension calculation is based on the Board's March 13, 2013 retirement approval date, as opposed to the February 22, 2011 disabling injury date, is consistent with the plain language of the Ordinance, as well as the CBA, and is entitled to deferential review. According to the Fund, the City Code does not compel a different conclusion. Although the City Code provides that an officer is entitled to the higher benefit, the parties negotiated and agreed upon the calculation of disability benefits from the date of retirement as reflected in the CBA. The Fund also cites case law in support of its position that Sheppleman is bound by the terms of the CBA and that the disability retirement pension calculation begins when the Board approves the retirement application, not when the officer is injured.

### 1. Ordinance

Section 143.03(f) of the Ordinance provides:

> [A]ny police officer who becomes permanently and totally disabled as a result of an injury incurred *while in the actual performance of his or her duty* and who, by reason thereof, is unable to perform his or her duties as a member of the police force *shall be entitled upon application to the Board to retire* and to receive a monthly pension. *Such pension shall be in an amount equal to one hundred percent (100%) of such police officer's average monthly earnings reportable or reported on the police officer's W-2 form for the twelve month period prior to his or her retirement.*

R.R. at 24a (emphasis added). The Ordinance does not define "retirement" or indicate the date to be used for the retirement calculation.

When terms are not defined, we turn to the rules of statutory construction, which are applicable to statutes and ordinances alike, for guidance. *Kohl v. New Sewickley Township Zoning Hearing Board*, 108 A.3d 961, 968 (Pa.

Cmwlth. 2015). "The interpretation of a statute or ordinance presents this Court with a pure question of law, which is generally subject to plenary review." *Id.*

The primary objective of statutory interpretation is to determine the intent of the enacting legislation. Section 1921 of the Statutory Construction Act of 1972 (Statutory Construction Act), 1 Pa. C.S. §1921. A statute's plain language generally provides the best indication of legislative intent, and, therefore, statutory construction. *Uniontown Newspapers, Inc. v. Pennsylvania Department of Corrections*, 243 A.3d 19, 32 (Pa. 2020). "Words and phrases shall be construed according to rules of grammar and according to their common and approved usage." Section 1903 of the Statutory Construction Act, 1 Pa. C.S. §1903. "Also, where a court needs to define an undefined term, it may consult dictionary definitions for guidance." *THW Group, LLC v. Zoning Board of Adjustment*, 86 A.3d 330, 336 (Pa. Cmwlth. 2014).

In construing the language, we must read the words in their context and with a view to their place in the statutory scheme. *Uniontown Newspapers, Inc.*, 243 A.3d at 32-33. Statutes that "are *in pari materia* when they relate to the same persons or things or to the same class of persons or things" must be "construed together, if possible, as one statute." Section 1932 of the Statutory Construction Act, 1 Pa. C.S. §1932. We also presume that the drafters do not intend an absurd or unreasonable result, 1 Pa. C.S. §1922(1), and that they intend the entire statute to be effective and certain. 1 Pa. C.S. §1922(2).

"If a statutory term, when read in context with the overall statutory framework in which it appears, has at least two reasonable interpretations, then the term is ambiguous." *Snyder Brothers, Inc. v. Pennsylvania Public Utility Commission*, 198 A.3d 1056, 1073 (Pa. 2018); *accord A.S. v. Pennsylvania State*

14

*Police*, 143 A.3d 896, 906 (Pa. 2016). When a term is ambiguous, we may resort to the statutory construction factors enumerated in Section 1921(c) of the Statutory Construction Act, 1 Pa. C.S. §1921(c). *Snyder Brothers*, 198 A.3d at 1073. These factors include the occasion and necessity for the statute, the circumstances under which it was enacted, the object to be attained, and the consequences of a particular interpretation. Section 1921(c) of the Statutory Construction Act, 1 Pa. C.S. §1921(c).

Traditionally, courts accord the agency charged with administering the ordinance great weight and deference. Section 1921(c)(8) of the Statutory Construction Act, 1 Pa. C.S. §1921(c)(8); *Mitman v. Police Pension Commission of City of Easton*, 972 A.2d 1276, 1282 (Pa. Cmwlth. 2009), *aff'd*, 23 A.3d 527 (Pa. 2011). However, we are also mindful pension statutes must be liberally construed in favor of the pensioner. *Mitman*, 972 A.2d at 1282.

With these tenets of statutory construction in mind, we examine the meaning of the term "retirement" within Section 143.03(f) of the Ordinance. The Fund argues that it refers to the date upon which the Board awards the service-connected disability and honorably discharges the officer from employment. Sheppleman argues that it refers to the date of the work injury, which permanently disabled him, rendered him unable to perform his duties, and entitled him to seek a service-connected disability pension.

According to Black's Law Dictionary, "retirement" refers to the "[t]ermination of one's own employment or career, esp. upon reaching a certain age or for health reasons; retirement may be voluntary or involuntary." Black's Law Dictionary 1431 (9th ed. 2019). The standard dictionary defines "retirement" as "**1 a :** "an act of retiring : the state of being retired **b :** withdrawal from one's position

15

or occupation or from active working life **c :** the age at which one normally retires . . . ." Merriam-Webster's Collegiate Dictionary 1007 (9th ed. 1987).

Applying the plain meaning, the term "retirement," as used within Section 143.03(f) of the Ordinance, refers to the date that an officer terminated his or her employment for health reasons. Within the context of Section 143.03(f) itself, that day could be the date of injury, because Sheppleman never returned to work because of his injury. On the other hand, it could also refer to the date of his honorable discharge because Sheppleman remained on the police force, albeit not on active duty, collecting compensation benefits for his injury until his honorable discharge. "Ordinarily, a word's usage accords with its dictionary definition. In law, as in life however, the same words, placed in different contexts sometimes mean different things." *Commonwealth v. Giulian*, 141 A.3d 1262, 1268 (Pa. 2016) (citation omitted). Because application of the plain meaning of the term "retirement" yields no definitive conclusion for the date to be applied, we examine its use within the overall statutory framework of Section 143.03 of the Ordinance to glean meaning. *See Snyder Brothers*, 198 A.3d at 1073.

Section 143.03 of the Ordinance provides different calculation formulas depending upon the retirement prerequisites, whether age and service or disability. Notably, different terms are used for the base calculation. When an officer is entitled to retire based on age and service requirements, the retirement provisions in the Ordinance calculate the pension benefit based on "salary." Section 143.03(a)-(c) of the Ordinance; R.R. at 24a-25a. Conversely, for an officer who becomes permanently and totally disabled in the line of duty, the Ordinance provides that pension benefits are calculated based on the "average monthly earnings," not "salary." Section 143.03(f) of the Ordinance; R.R. at 24a. When "earnings" are

16

referred to again in Section 143.03 of the Ordinance, the term refers to "earnings from employment" or "all aspects of earnings received from other employment." Section 143.03(f) of the Ordinance; R.R. at 24a-25a.

The choice of "earnings" as opposed to "salary" is meaningful. Neither term is defined in the Ordinance. Construing these terms according to their common and approved usage, the term "salary" generally denotes an employee's fixed annual payment for services regularly performed that excludes overtime or pay for extra work in the calculation of monthly pension benefits unless the parties through past practice or agreement have expanded the definition. *See Borough of Nazareth v. Nazareth Borough Police Association*, 680 A.2d 830, 834 (Pa. 1996); *see also* Black's Law Dictionary 585 (9th ed. 2009) (defining "salary" as "[a]n agreed compensation for services . . . usu. paid at regular intervals on a yearly basis, as distinguished from an hourly basis"). On the other hand, "earnings" can describe a variety of sources of income and is not limited to an employee's fixed salary. *See* Black's Law Dictionary 1454 (9th ed. 2009) (defining "earnings" as "[r]evenue gained from labor or services, from the investment of capital, or from assets"). "Earnings" are susceptible to fluctuation because they may encompass overtime, bonuses, commissions, and other remuneration for services provided.

Section 143.03(f)'s use of an officer's "*average* monthly earnings" over a 12-month period is also telling. The combination of "average" within a "12-month period" lends support that overtime or extra pay is anticipated in the calculation of earnings. "[O]vertime is necessitated by unforeseen circumstances and is unpredictable and is, therefore, variable rather than fixed." *Schmidt v. Borough of Stroudsburg*, 670 A.2d 208, 210 (Pa. Cmwlth. 1996), *aff'd*, 689 A.2d 223 (Pa. 1997). It is this very fluctuation that warrants an "average" to be used in the calculation to

17

provide an accurate picture of an officer's rate of pay over the course of one year. Conversely, when "salary" is used in the Ordinance, it consistently refers to an officer's fixed "yearly salary," "annual salary," or "current salary." *See* Section 143.03(a)-(e) of the Ordinance; R.R. at 23a-24a. When salary is "averaged" in the Ordinance, it is done so over the course of years, not months, to account for annual increases because monthly variations are not anticipated. *See* Section 143.03(b)(1) of the Ordinance; R.R. at 23a. When viewed in this context, Section 143.03(f)'s use of the phrase "average monthly earnings" in the calculation provision favors an interpretation that the calculation must be based on an officer's pre-injury earnings.

The Fund argues that "earnings" includes indemnity benefits collected under the Workers' Compensation Act and Heart and Lung Act. Under the Workers' Compensation Act, if an officer is temporarily or permanently incapacitated in the line of duty, he is entitled to receive two-thirds of his average weekly wage, which includes overtime. Section 306(b) of the Workers' Compensation Act, 77 P.S. §512; *Harper & Collins v. Workmen's Compensation Appeal Board  (Brown)*, 672 A.2d 1319, 1321 (Pa. 1996). Under Section 1(a) of the Heart and Lung Act, if an officer is "temporarily incapacitated from performing his duties," he is eligible to receive his full salary under the Heart and Lung Act, until the disability has ceased. 53 P.S. §637(a) (emphasis added).[11]

Indemnity benefits are different from earnings. Indeed, it is the "loss of earnings" caused by a work-related injury that occasions the receipt of indemnity benefits. *School District of Philadelphia v. Workers' Compensation Appeal Board (Lanier)*, 727 A.2d 1171, 1172 (Pa. Cmwlth. 1999). Indemnity benefits are an insurance benefit. Unlike earnings, they are not payment for labor or services

---

[11] Once a determination is made that the injury is permanent, Heart and Lung benefits stop, while workers' compensation benefits would continue.

performed; they are not subject to monthly fluctuation; and they are not taxable income. Therefore, Sheppleman's receipt of indemnity benefits cannot be construed as the equivalent of "average monthly earnings" in the context of pension calculations under the Ordinance. *See* R.R. at 24a.

Notwithstanding, the Fund places great emphasis on the fact that Sheppleman's Heart and Lung and workers' compensation payments were reported on his W-2 Forms and argues that these payments constitute "earnings reportable or reported in the officer's W-2 Form." Section 143.03(f) of the Ordinance; R.R. at 24a. The inclusion of the indemnity compensation payments on the W-2 Forms does not otherwise transform them into "earnings" because they are nontaxable insurance benefits. The Ordinance does not otherwise refer to or treat "compensation" as earnings, but as workers' compensation benefits. *See* Section 143.03(d), (f), (g) of the Ordinance; R.R. at 24a-25a.

In addition, Section 143.03(g) of the Ordinance recognizes "the City's obligation to pay wages under the Workers' Compensation Laws of the Commonwealth of Pennsylvania . . . *is not required to be reportable or reported on the police officer's W-2 [F]orm.*" R.R. at 25a (emphasis added). While taxable income is reported in box 1 of the W-2 Form, which includes wages, tips, and other compensation paid to the employee during the year, indemnity payments, if reported on the W-2 Form, are not taxable and are not included as income in box 1.

Furthermore, we note that Section 143.03(g) of the Ordinance, which governs retirement upon completion of 20 full years of continuous service and attainment of age 55, provides that the officer "shall receive an annual pension equal to one-half of such police officer's earnings reportable on . . . [the W-2 Form] in the twelve[-]month period prior to his or her election to retire." R.R. at 25a. It expressly

19

includes any service-related disability compensation benefits received during that period "in computing such police officer's pension benefit." *Id.* Notably, Section 143.03(f) does not include similar language directing the inclusion of such compensation benefits in the calculation of a permanently disabled officer's "average monthly earnings."

As illustrated here, Sheppleman's W-2 Form for 2012 showed taxable wages of $438.96 in box 1 and workers' compensation payments of $62,431.14 in box 14; his W-2 Form for 2013 similarly showed wages of $13.27 in box 1 and workers' compensation payments of $65,094.12 in box 14. S.F. No. 19, Exhibit H; R.R. at 271a, 348a. Sheppleman testified that these wages were owed to him from prior years but paid to him in 2012 and 2013. R.R. at 134a. If Sheppleman's earnings as reflected in box 1 of the W-2 Form preceding the Board's approval are used in the calculation, Sheppleman's pension would be almost zero because he had virtually no earnings. Such is an absurd result.

Considering the foregoing, when the term "retirement" is read within the context of Section 143.03(f) of the Ordinance, the date of injury is the only date that makes sense for calculation purposes for a disabled officer. Sheppleman was never able to return to work after the February 22, 2011 injury. The injury effectively removed him from the workforce and triggered his retirement, not any act of the Board. Nowhere does the Ordinance state that entitlement to disability retirement and its calculation is delayed until there is a decision by the Board. Although Sheppleman received compensation benefits under the Heart and Lung Act commensurate to his full salary, Sheppleman never received "earnings" for services performed in the line of duty after the injury. Because the drafters of the Ordinance expressly chose "average monthly earnings," as opposed to "salary," as

20

the basis upon which to calculate pension benefits, and did not include "compensation" in the calculation of those earnings, it is axiomatic that the date of injury must be used for calculation purposes. To conclude otherwise and use the date of the Board's approval would not accurately reflect Sheppleman's average monthly earnings and deflate Sheppleman's service-connected disability benefits to virtually nothing.

## 2. City Code

Next, the City Code provides additional support for this interpretation. The Ordinance must be read *in pari materia* with the City Code because they govern the same thing – police pensions. *See* Section 1932 of the Statutory Construction Act, 1 Pa. C.S. §1932. Section 14303(b)(1) of the City Code governs the apportionment of police pensions, providing that the basis of the apportionment of the pension

> [s]hall be determined by the rate of the monthly pay of the member at the *date of injury*, death, honorable discharge, vesting under section 14302.1 (relating to limited vested benefit) *or retirement*, or the highest average annual salary that the member received during any five years of service preceding injury, death, honorable discharge, vesting under section 14302.1 or retirement, *whichever is higher*.

11 Pa. C.S. §14303(b)(1) (emphasis added). Section 14303.2 of the City Code provides that, in the event of "total disability," an officer "shall be deemed to be fully vested in the police pension fund, regardless of the actual number of years of credited service, and shall be eligible for immediate retirement benefits." 11 Pa. C.S. §14303.2(a). The City Code also recognizes that it will take time to approve a pension. There must be a claim and proof of disability by "competent

medical evidence." 11 Pa. C.S. §14303.2(b), (c). Because the higher benefit is mandated, an officer is not financially prejudiced based upon any passage of time.

Although the City is a home rule municipality, there are limitations on its powers. The City is not authorized "to diminish the rights or privileges of any former municipal employee entitled to benefits or any present municipal employee in his pension or retirement system." Section 2962(c)(3) of the Home Rule Charter Law, 53 Pa. C.S. §2962(c)(3). Application of the date of injury as the retirement date for calculation of service-connected disability purposes is consistent with the City Code, which mandates the higher benefit.

The Fund argues that Section 14303.2 merely governs vesting and provides that an officer totally disabled in the line of duty is eligible for "immediate retirement benefits." 11 Pa. C.S. §14303.2. An officer, if disabled, shall be immediately vested under the applicable pension plan, as opposed to requiring the officer to attain age and service requirements. *Id.* According to the Fund, this section does not require that the calculation of benefits shall be based on the date of injury.

Although we agree that "eligibility and actual retirement are separate and distinct stages in the operation of this system and may occur years apart," *Kelly v. Loveland*, 15 A.2d 411, 416 (Pa. Super. 1940), we disagree that this distinction compels the Fund's interpretation regarding calculation. The City may not abridge Sheppleman's pension rights, but only enhance them. Because the date of injury provides the higher pension calculation for purposes of the City Code, this is the date that must be used in calculating his service-connected disability pension benefit.

22

**3. CBA**

Next, although the Fund recognizes that Section 14303(b)(1) of the City Code provides for the higher pension benefit between date of injury and date of retirement, the Fund argues that this section does not apply because the City and police bargaining unit collectively bargained for and agreed to the date of retirement in the CBA, not the date of injury. Even though that amounts to a lesser benefit, Sheppleman is bound by the terms of the CBA, which he has benefited from his entire career. In support, the Fund relies on *Norcini v. City of Coatesville*, 915 A.2d 1243, 1246 (Pa. Cmwlth. 2007).

> Article XXIII of the CBA covers disability pensions and provides:
>
> Any Police Officer who becomes permanently and totally disabled as a result of a disability incurred while in the actual performance of his or her duty and who, by reason thereof, is unable to perform his or her duties as a member of the police force shall be entitled to retire and receive a monthly pension. *Such pension shall be in an amount equal to one hundred percent (100%) of said Police Officer's average monthly earnings reportable or reported in the police officer's W-2 Form for the twelve (12) month period prior to his or her retirement.*

R.R. at 31a (emphasis added); *see* S.F. No. 7; R.R. at 271a.

"[I]t is beyond peradventure that [police] pensions are a mandatory subject of collective bargaining . . . ." *Perroz v. Fox Chapel Borough*, 143 A.3d 520, 527-28 (Pa. Cmwlth. 2016) (quoting *Borough of Mahanoy City v. Mahanoy City Police Department*, 948 A.2d 239, 242 (Pa. Cmwlth. 2008)). "[P]arties may not avoid limitations in a CBA, claiming that it conflicted with the law, after they voluntarily negotiated and agreed to the contracted provisions." *Norcini*, 915 A.2d at 1246; *see Grottenthaler v. Pennsylvania State Police*, 410 A.2d 806, 809 (Pa.

23

1980) ("[A] municipality [can]not avoid the effect of a term of the [CBA] it had entered into, by asserting that the contract provision was in violation of State law."); *Pennsylvania State Troopers Association v. Pennsylvania State Employes' Retirement Board*, 677 A.2d 1329, 1331 (Pa. Cmwlth. 1996) (holding that the petitioners were bound by the total result negotiated by the union on their behalf and could not selectively choose or reject parts of the CBA, even though the calculation of pensions under the CBA formula yielded a less beneficial result than the formula under the State Employees' Retirement Code, 71 Pa. C.S. §§5101-5956). "These principles apply regardless of whether it is the union rather than the public employer which seeks to disavow its bargain." *Perroz*, 143 A.3d at 528.

In *Norcini*, we held that an officer did not have the individual right to reject disability pension provisions set forth in the parties' negotiated CBA in favor of allegedly greater retirement benefits provided by statute that existed at the time of the officer's retirement. Recognizing that Section 2962(c)(5) of the Home Rule Charter Law prohibits a municipality from diminishing rights, we reviewed the statute. The provision at issue, former Section 4303 of the City Code, *formerly* 53 P.S. §39303,[12] did not require a 50% minimum pension benefit that the officer sought. Rather, it only mandated that an officer's pension benefit "shall not in any case exceed" 50% of the officer's annual salary. *Norcini*, 915 A.2d at 1248 (quoting former Section 4303 of the City Code). The provision set a ceiling for police pension benefits; it did not set a mandatory minimum that the officer sought. *Id.* Because the language in the statute did not mandate the disability pension the officer claimed, the officer was bound by the terms of the parties' CBA. *Norcini*, 915 A.2d at 1247. Such is not the case here.

_____

[12] Repealed by the Act of November 24, 2015, P.L. 242.

As discussed above, the City Code provides that the pension "*shall* be determined by the rate of the monthly pay of the member at the date of injury, death, honorable discharge, or retirement . . . *whichever is higher*." 11 Pa. C.S. §14303(b)(1) (emphasis added). The CBA's language regarding the calculation of the service-connected disability pension is consistent with the Ordinance. Even if we concluded that the parties had negotiated a lesser benefit, such would be contrary to the governing terms of the City Code and unenforceable. Under the City Code, the Board is obligated by law to provide the higher rate, which is achieved by utilizing the date of injury for the officer.

## 4. Case Law

Finally, the Fund relies on *Wright v. Lower Salford Township Municipal Police Pension Fund*, 136 A.3d 1085 (Pa. Cmwlth. 2016), for the proposition that the disability retirement pension calculation begins when the officer's retirement is approved. *Wright* involved a police officer who was honorably discharged as a result of a work-related injury. The officer filed suit seeking a disability pension pursuant to the Municipal Police Pension Law,[13] that added a mandatory disability pension for permanent service-connected injuries, which took effect one month before his honorable discharge. Whether the officer qualified for this added benefit hinged on when his disability became permanent. We held that the officer was totally and permanently disabled on the date of discharge, not the date of injury, and therefore he qualified for the enhanced pension benefit.

---

[13] Act of May 29, 1956, P.L. (1955) 1804, *as amended*, 53 P.S. §§767-778.

25

The predominate interpretive issue in *Wright* was how to define "permanent disability," and not "retirement," for calculation purposes. *Wright*, 136 A.3d at 1090. The officer in *Wright* was employed by a township, not a third class city. *Id.* at 1086. Therefore, the provisions of the City Code did not apply. The applicable Municipal Police Pension Law provision did not contain any language regarding the timing of a pension calculation or the immediacy of a pension upon injury. Notably, the officer in *Wright* "continued to perform his full-time duties, on and off, for years after the original injury." *Wright*, 136 A.3d at 1093. He was considered only partially disabled. *Id.* at 1091. Although the officer could perform light-duty work, the township's decision to terminate the officer's employment with an honorable discharge was "tantamount to a determination by the [township] that [the officer] incurred a total permanent disability and was indefinitely unable to perform employment-related duties because of a physical or mental impairment." *Id.* at 1092 (internal quotation and citation omitted). In other words, the township determined that the officer "was physically unable to perform his job as a police officer and that his disability was permanent rendering him unfit to serve as a police officer in any capacity." *Id.* at 1093. It was not until the township honorably discharged the officer that he was found to have suffered a total permanent disability. *Id.* The township's determination was the triggering event. Indeed, there was "no medical evidence, or any other evidence for that matter, to support a finding that [the officer] was totally and permanently disabled *before the* [*township*] *adjudicated him as such*." *Id.* (emphasis added). Because the officer was rendered permanently disabled as of the date of the township's decision, which occurred after the effective date of the statutory amendment, the officer qualified for the enhanced pension benefit. *Id.*

26

*Wright* is factually distinguishable from the case at hand. Unlike the officer in *Wright*, Sheppleman never returned to work after his February 22, 2011 injury in any capacity. According to the medical evidence, Sheppleman was totally and permanently disabled as a result of the work injury. For all intents and purposes, Sheppleman's separation from the workforce occurred on the date of the injury, not the date of the Board's decision. Although *Wright* is factually distinguishable, the analysis in *Wright* actually supports a calculation from the date of injury in this case based upon the medical evidence presented that Sheppleman was permanently disabled as a result of the injury.

Here, Sheppleman was fully eligible to retire from service under the pension system and acquired vested rights with respect to retirement pay on the date of the injury. Because Sheppleman never returned to work following the injury, and three panel physicians[14] opined that he was permanently and totally disabled as a result of this injury, the date of injury is the triggering event for retirement calculation purposes, not the date that the Board approved his retirement and honorably discharged him. Therefore, the date of injury is the operative date for calculating the service-connected award.

To conclude otherwise would punish Sheppleman and similarly situated officers who are not sure of the permanence of the disability on the date of injury, seek corrective surgeries and therapies in the hopes of returning to duty, and do not immediately apply for disability-related benefits. It also would give the Board the unbridled power to delay the approval date to reduce an officer's earnings. The

---

[14] Section 143.07 of the Ordinance requires the member to submit to a medical examination by a medical commission composed of three physicians. *See* R.R. at 322a.

27

Board should not have the ability to diminish the amount of benefits an officer is to receive based upon the timing of its decision.[15]

Based upon the foregoing, where, as here, an officer is incapable of performing his duties as a police officer, and never returns to work earning wages as a police officer, the "retirement" date as used within the calculation clause of Section 143.03(f) of the Ordinance refers to the date that the officer is injured, not the date that the Board approves his or her pension benefits.

### C. Equal Protection & Past Practice

Next, the Fund contends that the trial court's determination that the Board's calculation violated the equal protection clauses of the United States and Pennsylvania Constitutions is misguided because the Board's calculation is consistent with the language of the Ordinance, the CBA, and the past practice of calculating an officer's award based upon the 12-month period preceding retirement, and not the date of injury. The trial court ignored evidence of past practices and speculated that other explanations for the calculations may have existed. The trial court chose instead to compare this case to the grievance arbitrations of Officers Kevin Gyda, Joseph Kane, and Joseph Nealon, in which the pension was calculated from the date of injury or the date of application of benefits. The Fund maintains that these arbitration cases are factually distinguishable. In awarding the benefits in accordance with the arbitration awards, the Board noted that the approval and retroactivity of these pensions would not "set a precedent for the future." R.R. at 290a. Similarly, Officer Regina Butcher was awarded service-connected disability

---

[15] We do not suggest that such a delay occurred here. In fact, there is no evidence that the Board delayed making its determination. Sheppleman's last medical examination occurred on March 4, 2013 – just nine days prior to the Board's award of disability benefits.

benefits based on a date of injury for the purpose of reaching a global settlement. The context in which the awards were made are not similar and do not establish past practice to support the trial court's equal protection analysis.

The Equal Protection Clause in the Pennsylvania Constitution is found in article I, section 26, which states:

> Neither the Commonwealth nor any political subdivision thereof shall deny to any person the enjoyment of any civil right, nor discriminate against any person in the exercise of any civil right.

Pa. Const. art. I, §26.  The Equal Protection Clause in the United States Constitution, made applicable to the states, is found in Section 1 of the Fourteenth Amendment, which provides:

> All persons born or naturalized in the United States, and subject to the jurisdiction thereof; are citizens of the United States and of the state wherein they reside.  No state shall make or enforce any law which shall abridge the privileges or immunities of citizens of the United States; nor shall any state deprive any person of life, liberty, or property, without due process of law; nor deny to any person within its jurisdiction the equal protection of the laws.

U.S. Const. amend. XIV, §1.  Equal protection under both constitutions are analyzed under the same standards. *See Love v. Stroudsburg*, 597 A.2d 1137, 1139 (Pa. 1991). Where neither suspect classes nor fundamental rights are involved, there must be a rational basis for the disparate treatment between similarly situated persons. *Id.*

The Fund argues Sheppleman was not similarly situated because those awards were based on an arbitration award or litigation.  The Fund's argument is dependent upon its interpretation of the Ordinance, which we have rejected.  Even if we interpreted "retirement" as used in the calculation clause of Section 143.03(f)

29

of the Ordinance to mean date of the Board's retirement approval, the trial court did not err in finding that the Fund disparately treated members of the same class.

The parties stipulated that Officers Gyda, Kane, Nealon, and Butcher all received pension benefits retroactive to the date of injury or application for service-connected disability benefits. According to the parties' stipulations, on March 24, 2010, the Board voted to grant a full disability pension to Officer Kane retroactive to the "date of his injury" on December 11, 2006. R.R. at 324a. Officer Gyda was injured on October 3, 2005, and received a disability pension calculated as of the date of his application for service-connected disability benefits, pursuant to an arbitration award. *Id.* Officer Butcher was granted a disability pension on May 23, 2012, calculated as of the date of her injury on June 6, 2009. *Id.* In addition, the Board voted to grant a full disability pension to Officer Nealon on March 24, 2010, retroactive to the "date of his injury" in 2007.[16] *Id.*

The Fund maintains that it believed it was required to calculate the pensions retroactively for Officers Gyda, Kane, and Nealon based on an arbitration award in favor of Officer Gyda and the similarity among the cases. R.R. at 96a. It was noted that such award would not set a precedent for the future. R.R. at 97a. Officer Butcher's award was part of a global claim settlement. Notwithstanding these awards, the Fund maintains that all other awards were calculated from the date of retirement. In support, the Fund presented fact sheets for disability pensions awarded to nine officers that show that the service-connected disability benefits were

---

[16] According to Sheppleman's proposed findings, this finding is supported by his testimony and the Pension Board Minutes dated March 24, 2010, which were admitted into evidence by stipulation. R.R. at 324a. Although the Fund did not stipulate to this finding, it does not challenge this finding as unsupported by substantial evidence. Furthermore, the Board made the same finding in its determination. R.R. at 96a.

30

based on the 12-month period preceding retirement, not the date of injury. Trial Court Op., at 27. But, as the trial court noted, seven of the awards were made *after* Sheppleman's award on March 13, 2013, and, therefore, did not support a finding of *past* practice.[17] *Id.* As for the awards for the other two officers, Officers John Kaisner and Thomas Bright, on October 28, 2005, the trial court found that the Fund provided no evidence regarding the circumstances underlying these disability pensions. "Numerous possibilities exist as to why these pensions were calculated to the voted[-]upon[-]retirement date and not date of injury. The [o]fficers simply could not have challenged the . . . Board's decision or it's possible [that] they were awarded a higher calculation." *Id.*

Upon review, the evidence does not establish a past practice of calculating the pension benefit from the date of retirement, as opposed to the date of injury. Instead, the evidence shows that the Fund intentionally treated Sheppleman differently from similarly situated officers in the calculation of his pension without a rational basis. In so doing, the Fund violated Sheppleman's right to equal protection. This constitutional violation compels a calculation from the date of injury.

### D. Act 205

The Fund argues that the trial court erred by failing to consider whether its award complies with Act 205. Act 205 was passed in an effort to strengthen the pension plans of municipalities across the Commonwealth by ensuring actuarial soundness. In accordance with its purpose, Act 205 requires that, prior to the

---

[17] A past practice is based upon "an accepted course of conduct characteristically repeated in response to the given set of underlying circumstances." *County of Allegheny v. Allegheny Prison Employees Independent Union*, 381 A.2d 849, 852 (Pa. 1977).

31

adoption of any plan modification, there must be a cost estimate and analysis of the future financial impact on the plan. According to the Fund, the trial court's award artificially inflated an already generous disability benefit. The trial court enhanced the pension benefit without considering the impact it would have on the plan's actuarial soundness. Considering the dire fiscal condition of the City's Police Pension Fund, the trial court's award, without any attempt to justify it under Act 205, is a manifest abuse of discretion.

Section 301(a) of Act 205 provides:

> Notwithstanding any provision of law, municipal ordinance, municipal resolution, municipal charter, pension plan agreement or pension plan contract to the contrary, the applicable provisions of this chapter shall apply to any municipality which has established and maintains, directly or indirectly, a pension plan for the benefit of its employees, irrespective of the manner in which the pension plan is administered, and to the respective pension plan.

53 P.S. §895.301(a).

Additionally, Section 305(a) of Act 205 provides:

> Prior to the adoption of any benefit plan modification by the governing body of the municipality, the chief administrative officer of each pension plan shall provide to the governing body of the municipality a cost estimate of the effect of the proposed benefit plan modification.

53 P.S. §895.305(a).

Finally, Section 305(e) of Act 205 mandates:

> Any cost estimate of the effect of the proposed benefit plan modification shall be complete and accurate and shall be presented in a way reasonably calculated to disclose to the average person comprising the membership of the governing body of the municipality, *the impact of the*

32

> *proposed benefit plan*, the modification on the future financial requirements of the pension plan and the future minimum obligation of the municipality with respect to the pension plan.

53 P.S. §895.305(e) (emphasis added).

Neither an arbitration panel nor a reviewing court can require a municipality to implement a benefit plan *modification* in violation of Act 205. *See generally Shippensburg Police Association v. Borough of Shippensburg*, 968 A.2d 246 (Pa. Cmwlth. 2009) (holding that a grievance arbitrator who awards a modification of a police pension plan in the absence of a cost estimate requires an illegal act, necessitating vacation); *City of Scranton v. E.B. Jermyn Lodge No. 2*, 85 A.3d 1102 (Pa. Cmwlth. 2014) (holding that police union failed to comply with statutory requirements regarding the minimum funding standards for municipal pension plans in providing actuarial cost estimate for proposed maximum pension benefits increases, where union presented a four-page report from its actuary that showed the pension plan with approximately one-third unfunded liability and an unfunded amount increased under the union's proposed modifications; further, actuary expressly declined to offer any opinion about the legality of the proposed modifications to the pension plan, and union's cost estimate did not clearly address the actuarial soundness of the pension plan after the proposed modification).

Before the trial court, the parties stipulated that: the trial court's review was governed by Section 754(b) of the Local Agency Law, 2 Pa. C.S. §754(b); a complete record was created before the Board; and neither party could supplement the record. R.R. at 315a. The Fund presented no evidence regarding the applicability of Act 205 or actuarial cost estimates at the Board hearing. In fact, the Fund raised this issue for the first time before the trial court. *See* R.R. at 304a-06a.

33

Where a complete record is made, Section 754(b) of the Local Agency Law prohibits new facts from being introduced on appeal. 2 Pa. C.S. §754(b).

Nevertheless, the trial court's award does not violate Act 205. Pursuant to Section 305(a) of Act 205, 53 P.S. §895.305(a), only "plan modifications" enacted without a cost estimate violate Act 205. As discussed above, calculating a retirement pension based on date of injury is not a modification of the Fund, but is consistent with the Ordinance, the City Code, the CBA, and past practice.

### E. Timeliness

Lastly, the Fund contends that the trial court ignored the fact that Sheppleman's appeal is untimely. In July 2014, the Board provided service-connected disability benefits to Sheppleman, with a fact sheet regarding the calculation. Sheppleman had 30 days to appeal the Board's decision. The award of benefits and the calculation of those benefits constitute an adjudication triggering the appeal period. As of July 2014, Sheppleman was on notice of the Board's calculation and that he was aggrieved. Although Sheppleman expressed his disagreement with the calculation in a letter to City Controller, he never filed an appeal or requested a formal hearing to review the Board's calculations. Sheppleman waited until October 24, 2016, which is more than two years beyond the statutory deadline, to file a complaint in the trial court. While the parties agreed to remand the matter to the Board, the Fund never waived its right to raise procedural objections on appeal, including the failure to file a timely appeal. To allow such an untimely appeal here would effectively negate the Local Agency Law's statutory deadline.

Section 752 of the Local Agency Law provides:

> Any person aggrieved by an adjudication of a local agency who has a direct interest in such adjudication shall have the right to appeal therefrom to the court vested with jurisdiction of such appeals by or pursuant to Title 42 (relating to judiciary and judicial procedure).

2 Pa. C.S. §752.

Section 5571(b) of the Judicial Code, 42 Pa. C.S. §5571(b), provides that an appeal from a local agency adjudication must be commenced within 30 days. A local agency is "[a] government agency other than a Commonwealth agency." Section 101 of the Administrative Agency Law, 2 Pa. C.S. §101. An "adjudication" is defined as "[a]ny final order, decree, decision, determination or ruling by an agency affecting personal or property rights, privileges, immunities, duties, liabilities or obligations of any or all of the parties to the proceeding in which the adjudication is made." Section 101 of Administrative Agency Law, 2 Pa. C.S. §101.[18] "No adjudication of a local agency shall be valid as to any party unless he shall have been afforded reasonable notice of a hearing and opportunity to be heard." Section 553 of the Local Agency Law, 2 Pa. C.S. §553.

A municipality's calculation of a police officer's monthly pension benefit constitutes an adjudication appealable under the Local Agency Law, 2 P.S. §§101, 752. *See Palyok v. Borough of West Mifflin*, 551 A.2d 622, 625 (Pa. Cmwlth. 1988), *rev'd on other grounds*, 586 A.2d 366 (Pa. 1991); *see also Wortman v. Philadelphia Commission on Human Relations*, 591 A.2d 331, 333 (Pa. Cmwlth. 1991) (holding that a letter from the local human relations commission dismissing an employee's complaint of employment discrimination was an appealable adjudication under the Local Agency Law because the dismissal was final, affected

---

[18] Section 101 of the Administrative Agency Law, 2 Pa. C.S. §101, applies equally to local agencies governed by the Local Agency Law. *See Monaghan v. Board of School Directors of Reading School District*, 618 A.2d 1239, 1241 (Pa. Cmwlth. 1992).

the employee's rights, and left no other remedy or forum for the enforcement of the employee's rights).

Whether an adjudication is valid depends on whether there is an opportunity to be heard. *See Chudd v. Philadelphia*, 455 A.2d 1259 (Pa. Cmwlth. 1983). In *Chudd*, a city employee was awarded a service-connected disability pension in December 1978. The employee wrote to the governing body and complained that his pension was miscalculated and that he was entitled to an increased pension. The board did not act on the employee's complaint. A year later, the employee filed a complaint in the court of common pleas asking for relief. The city argued that the complaint was untimely and the trial court agreed. On appeal, we determined that there was no adjudication because the board refused the employee's request for a recomputation and no hearing was ever held. *Id.*; *see also Callahan v. Pennsylvania State Police*, 431 A.2d 946 (Pa. 1981) (holding that a letter notifying trooper that his benefits would be terminated did not constitute an adjudication triggering the 30-day appeal period because the trooper was never afforded a hearing).

While the City's calculation of Sheppleman's pension benefits, as reflected on the fact sheet, certainly put Sheppleman on notice of his claim and may have constituted an adjudication, it was not a valid or binding adjudication because Sheppleman was never afforded an opportunity to be heard. The fact sheet was never voted upon by the Board. The Board simply approved Sheppleman's disability pension by vote at the March 13, 2013 meeting, without calculating his benefit amount. R.R. at 234a. In July 2014, the City Controller issued the fact sheet. There is no evidence that the Board approved the fact sheet as an official act of the governing body or offered Sheppleman an opportunity to challenge the calculation

36

of his pension benefit. Consequently, the fact sheet does not constitute an adjudication triggering the 30-day statutory appeal period under Section 5571(b) of the Judicial Code.

## IV. Conclusion

Accordingly, we affirm the order of the trial court.

_____
MICHAEL H. WOJCIK, Judge

Judge Crompton did not participate in the decision of this case.

IN THE COMMONWEALTH COURT OF PENNSYLVANIA

Stephen Sheppleman                    :
                                      :
          v.                          : No. 458 C.D. 2020
                                      :
City of Chester Aggregated            :
Pension Fund,                         :
                                      :
          Appellant                   :

# **O R D E R**

AND NOW, this 29<u>th</u> day of <u>December</u>, 2021, the order of the Court of Common Pleas of Delaware County, dated April 22, 2020, is AFFIRMED.

_____
MICHAEL H. WOJCIK, Judge